# 25-0727-cv

## United States Court of Appeals
*for the*
## Second Circuit

LUISA JANSSEN HARGER DA SILVA,

*Plaintiff-Appellee,*

– v. –

NEW YORK CITY TRANSIT AUTHORITY, METROPOLITAN TRANSPORTATION AUTHORITY, RAQIA SHABAZZ,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLANTS

ANDREW P. KEAVENEY
TIMOTHY COLLAZZI
LANDMAN CORSI BALLAINE
& FORD P.C.
*Attorneys for Defendants-Appellants*
120 Broadway, 13th Floor
New York, New York 10271
(212) 238-4800

CP COUNSEL PRESS (800) 4-APPEAL • (383499)

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ ii

Corporate Disclosure........................................................................................ 1

Jurisdictional Statement ....................................................................................1

Issues Presented for Review ..............................................................................2

Statement of the Case........................................................................................ 2

Summary of the Arguments ...............................................................................7

Argument.........................................................................................................10

A. Legal Standard ....................................................................................10

B. Collateral Order Jurisdiction ...............................................................10

C. The Agency Defendants are entitled to governmental immunity from this suit. ..............................................................15

1. The District Court erred in failing to apply the governmental proprietary function test....................................15

2. The Agency Defendants are entitled to immunity under the governmental proprietary function test.....................19

D. The Agency Defendants are entitled to qualified immunity.......................20

CONCLUSION ...............................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affleck v. Buckley*,
96 N.Y.2d 553 [2001] ........................................................ 22, 23, 26

*Applewhite v Accuhealth, Inc.*,
21 N.Y.3d 420 [2013] ........................................................ 17

*Bolmer v Oliveria*,
594 F.3d 134 [2d Cir. 2010] ........................................................ 1, 12

*Bonner v. City of New York*,
73 N.Y.2d 930 [1989] ........................................................ 19

*Byrne v. City of New York*,
17 Misc.3d 1101(A)[Richmond Sup. Ct. 2007] ........................................................ 27

*Calabrese v City of Albany*,
43 N.Y.3d 167 [NY 2024] ........................................................ 20

*CBS Outdoor Inc. v City of New York*,
50 Misc.3d 283 [Sup Ct, NY County 2015] ........................................................ 20

*County of Westchester v. Vil. of Mamaroneck*,
41 Misc.2d 811 [1964], *aff'd* 22 A.D.2d 143 [2 Dept. 1965] ........................................................ 19

*Digital Equip. Corp. v. Desktop Direct, Inc.*,
511 U.S. 863 [1994] ........................................................ 11

*Doe v. City of New York*
67 A.D.3d 854 [2 Dept 2009] ........................................................ 16

*Edouard v Bonner*,
224 A.D.2d 575 [2 Dept 1996] ........................................................ 25

*EM Ltd. v. Banco Central De La Republica Argentina*,
800 F.3d 78 [2d. Cir. 2015] ........................................................ 13

*Enker v. Cnty of Sullivan*,
162 A.D.3d 1366 [3 Dept 2018] .......... 22

*Farber v. New York City Trans. Auth.*,
143 A.D.2d 112 [2 Dept 1988] .......... 19

*Ferreira v City of Binghamton*,
38 N.Y.3d 298 [2022] .......... 18

*Friedman v. State of New York*
(67 N.Y.2d 271 [1986]) .......... 14, 25, 26

*Garcia v San Antonio Metro. Transit Auth.*
(469 U.S. 528 [1985]) .......... 17

*Grasso v New York State Thruway Auth.*,
159 A.D.3d 674 [2018] .......... 16

*Griggs v Provident Consumer Discount Co.*,
459 U.S. 56 [1982] .......... 11

*Haddock v City of New York*,
75 N.Y.2d 478 [1990] .......... 15, 18

*Harford v. City of New York*,
194 A.D.2d 519 [2 Dept 1993] .......... 22

*Harlow v. Fitsgerald*,
457 U.S. 800 [1982] .......... 23

*Heins v Vanbourgondien*,
180 A.D.3d 1019 [2 Dept 2020] .......... 21

*Horn v. Med. Marijuana, Inc.*,
80 F.4th 130 [2d Cir. 2023] .......... 10

*Jourdain v Metropolitan Transp. Auth.*,
219 A.D.3d 876 [2 Dept 2023] .......... 20

*Kistner v City of Buffalo*
2023 WL 21219 [WDNY] .......... 11



4932-7183-0373v.2

*Kovit v Estate of Hallums*,
4 N.Y.3d 499 .......... 10

*Lewis v. City of New York*,
131 A.D.3d 1134 [2 Dept 2015] .......... 27

*Liberty Synergistics, Inc. v. Microflo Ltd.*,
718 F.3d 138 [2d Cir. 2013] .......... 12

*Lieberman v Port Auth. of NY and NJ*,
132 N.J. 76 [NJ 1993] .......... 16

*Malley v Briggs*,
475 U.S. 335 [1986] .......... 24

*McCord v City of New York*,
298 A.D.2d 438 [2 Dept 2002] .......... 21

*McCormack v. City of New York*,
80 N.Y.2d 808 [1992] .......... 23

*McCrae v New York City Tr. Auth*,
123 A.D.3d 598 [1 Dept 2014] .......... 20

*Messerschmidt v. Millender*,
565 U.S. 535 [2012] .......... 25

*Miller v. State of New York*,
62 N.Y.2d 506 [1984] .......... 15, 16

*Mitchell v. Forsyth*,
472 U.S. 511 [1985] .......... 11, 13, 14

*Nehrbas v. Inc. Vil. of Lloyd Harbor*,
2 N.Y. 190 [1957] .......... 17

*O'Brien v. Town of Greenburgh*,
239 A.D. 555 [2 Dept 1933], *aff'd without opn* 266 N.Y. 582 [1935] .......... 17

*Perlov v Port Auth. of N.Y. & N.J.*,
189 A.D.3d 1624 [2 Dept 2020] .......... 17

*Ramirez v State of New York*,
143 A.D.3d 880 [2 Dept 2016] .......................................................................21

*Riddell v City of New York*,
209 A.D.3d 891 [2 Dept 2022] .......................................................................24

*Rodriguez v. Palacio*,
199 A.D.3d 728 [2 Dept 2021] .......................................................................27

*Royal Crown Day Care LLC v. Dep't of Health and Mental Hygiene of City of New York*,
746 F.3d 538 [2d Cir. 2014] .........................................................................12

*Saucier v. Katz*
(533 U.S. 194 [2001]) ...................................................................................26

*Selca v. City of Peekskill*,
78 A.D.3d 1160 [2 Dept 2010] ................................................................25, 27

*Tellier v. Fields*,
280 F.3d 69 [2d Cir. 2000] ............................................................................13

*Turturro v City of New York*,
28 N.Y.3d 469 [2016] ....................................................................................18

*Van De Bogart v. State*,
133 A.D.2d 974 [3 Dept 1987] .......................................................................21

*Vays v. County of Orange*,
214 A.D.3d 689 [2 Dept 2023] .......................................................................26

*Weiss v Fote*,
7 N.Y.2d 579 [1960] ................................................................................*passim*

*Zambrana v New York City Tr. Auth.*,
14 A.D.3d 23 [1 Dept 2004] ...........................................................................21

**Statutes**

28 U.S.C. § 1291 ........................................................................................11

28 U.S.C. § 1332 ..........................................................................................1

Federal Rules of Appellate Procedure Rule 26.1 ............................................1

New York Public Authority Law § 1202 .......................................................5

New York Public Authority Law § 1264[2] ..................................................5

New York Public Authority Law § 1212 ......................................................15

New York Public Authority Law § 1276 ......................................................15

## Corporate Disclosure Statement

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, and to enable Judges of the court to evaluate possible disqualification or recusal, the undersigned counsel for Defendants-Appellants New York City Transit Authority ("NYCTA") and Metropolitan Transportation Authority ("MTA") certify that NYCTA and MTA are New York public benefit corporations organized and existing pursuant to §§ 1201 and 1263, respectively, of the New York Public Authority Law ("NYPAL").

## Jurisdictional Statement

The District Court has original jurisdiction of this civil action based on the amount in controversy and diversity of citizenship of the parties. 28 U.S.C. § 1332. Plaintiff-Appellee Luisa Janssen Harger DaSilva, at the time of filing her complaint, was a Brazilian foreign national and Defendants-Appellants Metropolitan Transportation Authority and New York City Transit Authority are New York public authorities. Plaintiff seeks damages in excess of $75,000.

The United States Court of Appeals for the Second Circuit has jurisdiction to hear this interlocutory appeal pursuant to the collateral order doctrine in that the District Court denied Defendants-Appellants' motion for summary judgment on their governmental and qualified immunity defenses. *See Bolmer v Oliveria*, 594 F.3d 134, 141 [2d Cir. 2010].

Defendants-Appellants timely filed its notice of appeal of the District Court's March 6, 2025 order on March 27, 2025. (Appendix ["App."] at 158.)

## Issues Presented for Review

1. Did the District Court err in denying Defendants-Appellants summary judgment on the issue of governmental function immunity, even though Defendants-Appellants are public authorities established for the benefit of the people of the State of New York, and that Plaintiff-Appellee sought to impose liability based on Defendants-Appellants performing a governmental function?

2. Did the District Court err in denying Defendants-Appellants summary judgment on the issue qualified immunity, even though Defendants-Appellants studied and passed on the very same question of risk that is at issue in this case?

## Statement of the Case

In 2016, Plaintiff-Appellee Luisa Janssen Harger DaSilva was injured when she fainted while waiting on a platform at the Atlantic Avenue-Barclays Center subway station and fell onto the tracks in front of an oncoming train. Appellee contends, *inter alia*, that Defendants-Appellants Metropolitan Transportation Authority and New York City Transit Authority ("the Agency Defendants") are liable for the accident on the new and untested theory that the Agency Defendants "should have" installed platform screen doors (PSDs) - - ***which are not used in any heavy***

***rail system in the United States*** - - within the 120-plus year old subway system.[1]

Although Plaintiff-Appellee presents a novel tort claim, the Agency Defendants have been continuously researching, evaluating, and considering the efficacy of installing platform barriers in the subway system since the 1990's. Their efforts have included, among other things, trips to assess platform barriers in foreign cities; retaining contractors to assess the feasibility of installing platform barriers in new stations and retrofitting existing stations; establishing internal task forces to investigate their use; soliciting information from experienced platform barriers manufacturers and installers; and evaluating (and even testing) other potential customer safety devices.

During discovery, the Agency Defendants produced over a dozen deposition witnesses and approximately one hundred thousand documents that confirmed their efforts to study the effectiveness and feasibility of platform barriers and the reasons they "passed on the matter" including that they: (1) were not feasible at the majority of stations, ***including the subject station where the accident occurred***; (2) create their own safety risks to the public (*e.g.*, people getting trapped in the space between platform doors and trains; passengers trapped on the train if a PSD did not open

---

[1] New York City Transit operates, manages, and maintains over 6,000 train cars on 25 lines through 472 elevated and subterranean stations on over 720 miles of track. Prior to the Covid-19 pandemic, NYCT averaged 5.5 million weekday subway rides and approximately 1.7 billion annual rides. Daily trains totaled over 8,000 trips with over 1 million individual door panel openings/closings.

properly); (3) require uniform train configurations;[2] (4) need electrical requirements which current stations are not equipped to source; (5) present airflow/ventilation issues; and (6) present challenges to the efficiency of Defendants' 24 hour/7 days per week system if/when a barrier inevitably needs repairs and/or routine maintenance.

The Agency Defendants also considered and tested track intrusion detection systems (TIDS). This developing technology uses sensors and cameras to detect unauthorized access to track areas.[3] Pilot studies were conducted in stations both before and after plaintiff's accident (in 2014 and 2018 respectively). It was then-estimated that the total approximate system-wide costs (at all 1,237 platforms across 472 stations) just for installation would be $3 billion. Despite these issues, the Agency Defendants assessed, researched, and implemented alternatives to enhance system and passenger safety.

The Agency Defendants filed their motion for summary judgment seeking to

---

[2] The history of City-wide subway transit is complex. The first subways formed in New York, in 1904, were *operated and maintained* by private companies via long-term leases with the City of New York. In the 1950s, the New York City Transit Authority (NYCT) was created to operate the three separate transit companies (BMT, IRT, and IND) as a single system. Different methods were used to construct the subway stations, consistent with building codes and customs and practice at the time. Different car classes (widths and lengths) were also used within the system, which continues to prevent the operation of certain trains on the numbered lines from operating on certain tracks along the "letter" lines, and vice versa.

[3] Track intrusion detection systems are advance warning systems which are designed to detect existing hazards on the right of way and to notify the train operator, via rail transit control, of the potential condition. However, they would be ineffective when objects suddenly appear before a train with limited distance to stop, which is the circumstance in this case.

dismiss the complaint on the grounds that: (1) they were not negligent for the operation of their train; and (2) they are entitled to both governmental and qualified immunity. Regarding governmental immunity, the Agency Defendants argued that, as public corporations formed "for the benefit of the people of the state of New York" (NYPAL §§ 1202 and 1264[2]), they exercise a governmental function when they make systemwide policy decisions on prioritizing limited capital funding, balancing different classes of public safety by need and probability, and weighing possible advances in technology against its installation feasibility (structurally, mechanically, electrically, and physically) and the technology's creation of new threats to public safety. (ECF Doc. Nos. 242-247.)

As for qualified immunity, the Agency Defendants argued that their policy decisions concerning platform barriers and other devices were reasonably based on passenger safety, feasibility and funding, and followed extensive studies into the new technologies and other means and methods to mitigate the risk.

On March 6, 2025, the District Court denied the Agency Defendants' motion. (App. at 145-147.) In deciding the governmental immunity issue, the District Court said, "New York state courts have consistently held that *operating* the subway system is a proprietary function" (App. at 151 [emphasis added]) and summarily denied the motion based on those cases (*id*. at 152). Critically, the District Court *did not* find any issue of fact regarding the governmental immunity defense.

The District Court, in deciding the qualified immunity issue, merely referred to the Defendants' "alleged" proof set forth in a declaration of a NYCT employee regarding events (which happenings are not contested), *e.g.*, "NYCT[] allegedly took international trips to assess PSDs and TID[S], employed engineering firms to assess PSDs, and tested TID[S], among other efforts" and that "[i]nstalling PSDs would allegedly cost around $7 billion." (*Id*. at 153).

The District Court then cited plaintiff's expert, Dr. Carl Berkowitz, a self-proclaimed transportation engineering expert:

> [Dr. Berkowitz] claims that the documents Defendants cite do not qualify as reasonable safety studies under industry standards. And Plaintiff cites to an offer by the Seoul Metropolitan Rapid Transit Corporation Authority ("SMRT") to install PSDs under a 30-year Build-Operate-Transfer agreement in New York, where the SMRT would cover costs to construct and maintain the PSDs in exchange for advertising rights on the doors of the platform screens. Defendants respond that the SMRT proposal is not feasible because the lost advertising revenue would exceed the PSD installation costs. (App. at 153.)

The District Court concluded that "[t]here exist genuine disputes of material fact regarding whether the decision not to install PSDs and TID[S] at the subject station had a *reasonable basis*. Credibility assessments of experts "are matters for the jury, not for the court on a motion for summary judgment. Thus, the jury ought to resolve these factual disputes." (App. at 153-154 [emphasis added]).[4]

[4] The District Court also denied Defendants-Appellants summary judgment as it applies to the common law negligence cause of action (App. at 154-155). Defendants-Appellants have not, and cannot (at this stage), appeal that portion of the order.

Essentially, the District Court held that whether the Agency Defendants are entitled to qualified immunity is based on the "correctness" of the Agency Defendants' decisions (as argued by plaintiff's expert) and not the clearly established legal standard of whether the Agency Defendants studied and passed on the very question of risk at issue, effectively relegating the determination regarding the feasibility of extensive system modifications and technology additions costing billions of dollars into the over century old transit system to 6 lay persons sitting on a jury, instead of transit industry experts that the Legislature has entrusted to manage, operate, and maintain the New York City subway system.

**Summary of the Arguments**

This Court has jurisdiction to hear this appeal under the collateral order doctrine. The issues of governmental and qualified immunity can be "conclusively determined" from the merits of the action. And, because both governmental and qualified immunity provide *immunity from suit*, the harm done to the Agency Defendants cannot be repaired upon an appeal of final judgment.

The Agency Defendants are entitled to governmental immunity. Under the governmental-proprietary test, the Court should focus on "the specific act or omission" complained of - - here, the Agency Defendants' safety and security policy decisions. And, the New York Court of Appeals has said "any issue relating to the safety and security of an individual claimant must be carefully scrutinized" to

determine where on the governmental/proprietary spectrum it falls. Consequently, courts have found that issues relating to safety, maintenance, and construction are governmental functions.

The Agency Defendants are also entitled to qualified immunity. It is of no moment that Plaintiff has proffered expert testimony surmising that the Agency Defendants "did not perform an adequate safety study" *or* pointed to an offer to install PSDs at *some* stations - - ***but not the at-issue station***. Indeed, the record is clear that the Agency Defendants have been studying PSDs and TIDS for decades and have made well-reasoned decision to "pass" on them. The Agency Defendants established that they:

- made multiple international trips to assess working PSD and TID systems, which were followed by summary reports identifying, among other things, challenges to installing them into the century old subway system;
- requested information from existing PSD-manufacturers and stakeholders to assess the possible installation of PSDs into the subway system, along with cost sharing alternative fundings arrangements;
- developed a "Concept of Operations" that assessed potential stakeholders and the "pros and cons" of PSDs that included safety and security, maintenance, ADA issues, station ventilation and infrastructure, car classes, and operating procedures;
- employed outside engineering firms to assess PSDs in new and existing stations;
- assessed hazards associated with installing PSDs and TIDS;

- participated in industry assessments of PSDs;
- analyzed unsolicited proposals regarding PSDs;
- formed internal task forces and working groups to assess the potential for retrofitting PSDs and TIDS into the existing subway system;
- met with PSD vendors and stakeholders;
- assessed costs, potential delays, and infrastructure concerns with integrating PSDs into ongoing and nearly completed capital projects;
- analyzed different forms of PSDs (e.g., half v. full height; swinging v. sliding);
- planned pilot studies of PSDs and TIDS;
- conducted TIDS pilots and assessed their systemwide installation cost at $3 billion;
- conducted a 2½ year feasibility study regarding the installation of PSDs in each subway station which revealed that, assuming train size and door location can be homogenized, PSD installation will only be feasible at 27% of stations (and not the station where plaintiff's accident occurred) which would cost approximately $7 billion plus an additional $119 million annual maintenance costs; and
- implemented other system-wide tools and mitigation strategies to address customers' contact with trains such as awareness campaigns, station announcements (in multiple languages), timeclocks, tactile warning strips, lighting changes, posters, and help point kiosks.

(App. at 121-2, 136-140, and 142-144.)

Plaintiff and her expert dispute the efficacy of these efforts and the correctness of Defendants' decision to "pass" on platform barriers. However, immunity applies

"when the conduct complained of 'involves the exercise of professional judgment,' even if the judgment was poor" (*Kovit v Estate of Hallums*, 4 N.Y.3d 499, 506, *quoting Kenavan v City of New York*, 70 N.Y.2d 558 (1998]). Therefore, to allow a jury to second guess the Agency Defendants' extensive study of these new technologies, and the well-reasoned decision to concur with the heavy rail industry in the U.S. to "pass" on platform barriers and TIDS, "would be to obstruct normal governmental operations and to place in inexpert hands what the Legislature has seen fit to entrust to experts" (*Weiss v Fote*, 7 N.Y.2d 579, 586 [1960]).

## Argument

### A. Legal Standard

It is well-established that a Circuit Court's review of a District Court's decision on a motion for summary judgment is *de novo*. *Horn v. Med. Marijuana, Inc.*, 80 F.4th 130, 135 [2d Cir. 2023], *quoting Covington Specialty Ins. Co. v. Indian Lookout Country Club, Inc.*, 62 F.4th 748, 752 [2d Cir. 2023]). Moreover, the collateral order doctrine permits this Court to hear non-final interlocutory appeals.

### B. Collateral Order Jurisdiction

The initial question for this Court, which the District Court claims it decided,[5] is whether there is appellate jurisdiction over the immunity claims.

[5] The District Court stepped into the shoes of the Second Circuit and granted plaintiff's motion to deem Defendants' appeal as frivolous based on its interpretation of the scope of this Court's

Generally, this Court has "jurisdiction of appeal from all final decisions of the district courts" (28 U.S.C. § 1291) *and* the "narrow class of decisions that do not terminate the litigation, but must, in the interest of 'achieving a healthy legal system,' nonetheless be treated as 'final'" (*Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 867 [1994]). Regarding the later, the Supreme Court has explained that when the district court "determine[s] claims of right separable from, and collateral to, rights asserted in the action [that are] too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated" (*Mitchell v. Forsyth*, 472 U.S. 511, 524-5 [1985] [citation omitted]). Indeed, "a decision 'final' within the meaning of §1291 does not necessarily mean the last order possible to be made in a case" (*Id*. at 524, *quoting Gillespie v United States Steel Corp*., 379 U.S. 148, 152 [1964]). An order denying a defendant's claim of immunity raised in a summary judgment motion meets this narrow class of cases. As it should. Unless it can be reviewed before the proceeding terminates, it can never be reviewed at all" (*Id*. at 525, *citing Stack v Boyle*, 342 U.S. 1, 12 [1952]).

---

jurisdictions [Docket No. 18]. However, as the District Circuit in *Kistner v City of Buffalo* (2023 WL 21219 [WDNY]) observed, "the Second Circuit has not endorsed the dual jurisdiction rule [and therefore] remains bound by the general rule that an appeal 'divests the district court of its control over those aspects of the case involved in the appeal' (*see Griggs v Provident Consumer Discount Co.*, 459 U.S. 56, 58 [1982]), and leaves the question of appellate jurisdiction to the Second Circuit."

An interlocutory appeal under such circumstances is proper under the collateral order doctrine and grants this Court appellate jurisdiction (*See Bolmer v. Oliveira*, 594 F.3d 134, 140 [2d Cir. 2010]). To qualify as a "collateral order appeal," three conditions must be present: "that an order [1] conclusively determines the disputed question, [2] resolves an important issue completely separate from the merits of the action, and [3] be effectively unreviewable on appeal from a final judgment" (*Liberty Synergistics, Inc. v. Microflo Ltd.*, 718 F.3d 138, 146 [2d Cir. 2013], *quoting Will v. Hallock*, 546 U.S. 345, 349 [2006]). Moreover, "where the district court denied immunity on summary judgment because genuine issues of material fact remained, [this Court has] jurisdiction to determine whether the issue is *material*, but not whether it is *genuine*" (*Bolmer*, 594 F.3d at 141). As this Court has explained, "a district court can[not] fully insulate a qualified immunity denial from appellate review by simply declaring that genuine issues of fact exist" (*Royal Crown Day Care LLC v. Dep't of Health and Mental Hygiene of City of New York*, 746 F.3d 538, 542 [2d Cir. 2014], *quoting DisStiso v. Cook*, 691 F.3d 226, 239 [2d Cir. 2012]). Accordingly, on an interlocutory appeal, a defendant's challenge of a qualified immunity denial is limited to "contest[ing] the existence of a dispute or the materiality thereof as a matter of law, or contend[ing] that he is entitled to qualified immunity even under plaintiff's version of []facts" (*Id.*). Such challenges "present[]

a purely legal question that [this Court] ha[s] jurisdiction to review" (*Tellier v. Fields*, 280 F.3d 69, 78 [2d Cir. 2000]).

Initially, a denial of governmental immunity, which is akin to sovereign immunity, satisfies the above conditions. As this Court previously held, the above "collateral order" test is satisfied because "[1] the district court's ruling on sovereign immunity conclusively determined the issue of subject matter jurisdiction; [2] the issue of jurisdiction is separate from the merits; and [3] an appeal from final judgment cannot repair the damage caused to a sovereign that is improperly required to litigate a case" (*EM Ltd. v. Banco Central De La Republica Argentina*, 800 F.3d 78, 87 [2d. Cir. 2015]). Moreover, there can be no dispute that governmental immunity is immunity from suit.

Likewise, a denial of qualified immunity also satisfies the collateral order jurisdictional requirements. In *Mitchell, supra*, the Supreme Court determined that a finding the Attorney General was not immune from suit under qualified immunity standard was appealable. In doing so, the Court held that:

> ***The entitlement is an immunity from suit rather than a mere defense to liability***; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial. Accordingly, the reasoning that underlies the immediate appealability of an order denying absolute immunity indicates to us that the denial of qualified immunity should be similarly appealable: in each case, the district court's decision is effectively unreviewable on appeal from a final judgment.

(*Id.* at 526-7 [emphasis added]).

The Mitchell Court recognized "that qualified immunity is in part an entitlement not to be forced to litigate the consequences of official conduct that a claim of immunity is conceptually distinct from the merits of the plaintiff's claim" (*Id*. at 527-8).

Similarly, the New York Court of Appeals, in *Friedman v. State of New York*, (67 N.Y.2d 271 [1986]), held "to accept a jury's verdict as to the ***reasonableness*** and safety of a plan of governmental services and prefer it over the judgment of the governmental body which originally considered and passed on the matter would be to obstruct normal governmental operations and to place in inexpert hands what the Legislature has seen fit to entrust to experts" (*Id*. at 283-4 [emphasis added]; *compare* the District Court's decision – "whether the decision not to install PSDs and TIDS at the subject station had a reasonable basis" should be resolved by a jury). If the decision regarding "the reasonableness and safety of a plan of governmental services" is outside the province of a jury, the only rational conclusion is that qualified immunity asserted in this matter is immunity from suit. Accordingly, this instant case satisfies the "conclusive" prong, because the court's denial of summary judgment finally and conclusively determines the defendant's claim of right not to stand trial on the plaintiff's allegations" (*Mitchell*, 472 U.S. at 527). As such, this Court has jurisdiction to hear this appeal.

### C. The Agency Defendants are entitled to governmental immunity from this suit.

The District Court erred in denying the Agency Defendants' motion for summary judgment on the issue of governmental function immunity. Indeed, the District Court - - purportedly "adher[ing] to the holdings of New York courts" - - summarily ruled that the "operation of the subway system is a proprietary function" (Dec. at 8). However, the District Court - - *despite being obligated to do so* - - failed to examine the *specific function/task for which Plaintiff seeks to hold Defendants liable*. Here, Appellee seeks to hold the Agency Defendants liable for its reasoned decision not to install platform barriers *across its entire system*. This alleged "failure" plainly falls under the Agency Defendants' governmental function and, accordingly, Counts 2 and 3 of the Complaint must be dismissed.

#### 1. The District Court erred in failing to apply the governmental proprietary function test.

It is well settled that "[p]ublic entities remain immune from negligence claims arising out of the performance of their governmental functions" (*Miller v. State of New York*, 62 N.Y.2d 506, 510 [1984]). Although public entities may waive immunity from suit (*see* NYPAL §§ 1212 and 1276), they still enjoy immunity "when official action involves the exercise of discretion or expert judgment in policy matters and is not exclusively ministerial" (*Haddock v City of New York*, 75 N.Y.2d 478, 484 [1990]). As such, "[t]he relevant inquiry in determining whether a

governmental agency is acting within a governmental or proprietary capacity is to examine 'the specific act or omission out of which the injury is claimed to have arisen and the capacity in which that act or failure to act occurred . . . , not whether the agency involved is engaged generally in proprietary activity or is in control of the location in which the injury occurred'" (*Grasso v New York State Thruway Auth.*, 159 A.D.3d 674, 677 [2018], *quoting Matter of World Trade Ctr. Bombing Litig.*, 17 N.Y.3d 428, 447 [2011]). Indeed,

> ***A governmental entity's conduct may fall along a continuum of responsibility*** . . . . The spectrum extends gradually out to more complex measures of safety and security for a greater area and populace, whereupon the actions increasingly, and at a certain point only, involve governmental functions . . . . ***Consequently, any issue relating to the safety or security of an individual claimant must be carefully scrutinized to determine the point along the continuum that the . . . alleged negligent action falls into, either a proprietary or governmental category***.

(*Miller*, 62 N.Y.2d at 512 [emphasis added]).[6]

"Because this dichotomy is easier to state than to apply in some factual

[6] To illustrate this spectrum, the New Jersey Supreme Court, in an action involving a robbery at the Port Authority Bus Terminal in Manhattan, deduced that "providing better lighting" would likely appear closer to the landlord end of the spectrum, "[p]roviding security cameras, closing off deserted areas of the building, and establishing measures for crowd control" would be closer to the middle while addressing issues with the homeless would be in the governmental end of the spectrum. (*Lieberman v Port Auth. of NY and NJ*, 132 N.J. 76 , 96 [NJ 1993].) *Lieberman* was cited favorably by at least one New York Court - - *Doe v. City of New York* (67 A.D.3d 854 [2 Dept 2009]) which held: "The MTA/LIRR made a policy decision to address the issue of homelessness by employing a social outreach program, rather than by forcibly removing homeless individuals from their property. This was a discretionary governmental decision for which there can be no liability" (*Id.* at 857).

scenarios, the determination categorizing the conduct of a municipality may present a close question for the courts to decide" (*Applewhite v Accuhealth, Inc.*, 21 N.Y.3d 420, 425 [2013]). Therefore, the simplistic historical look back used by the District Court, cannot be the sole basis for determining a public entity's functions that relate to claims in a personal injury lawsuit. Indeed, the Supreme Court, in *Garcia v San Antonio Metro. Transit Auth.* (469 U.S. 528, 546 [1985]) recognized this problem when it held that "[m]any governmental functions of today have at some time in the past been non-governmental" and that "the people - - acting not through the courts but through their elected legislative representatives - - have the power to determine as conditions demand, what services and functions the public welfare requires." *See also Dep't of Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43 [2015][finding Amtrak is a governmental entity for Separation of Powers purposes - - despite the purported "historic" private nature of passenger rail operations].) The New York Court of Appeals has likewise accepted these changes, and have held that certain functions labeled proprietary in the past, *e.g.*, garbage collection/disposal (*see O'Brien v. Town of Greenburgh*, 239 A.D. 555 [2 Dept 1933], *aff'd without opn* 266 N.Y. 582 [1935]), have subsequently evolved into governmental functions (*see Nehrbas v. Inc. Vil. of Lloyd Harbor*, 2 N.Y. 190, 195, n. 1 [1957]).

Therefore, the District Court "must have" (*Perlov v Port Auth. of N.Y. & N.J.*, 189 A.D.3d 1624 [2 Dept 2020]) - - but did not - - "examine the specific act or

omission out of which the injury is claimed to have arisen and the capacity in which that act or failure to act occurred" (*Turturro v City of New York*, 28 N.Y.3d 469 [2016][internal quotation omitted]; *see also Ferreira v City of Binghamton*, 38 N.Y.3d 298 [2022] ["A municipality's varied functions may be interspersed with both governmental and proprietary elements and, therefore, the determination of the primary capacity under which a governmental agency was acting turns solely on the acts or omissions claimed to have caused the injury").

Of course, "[g]overnmental immunity under the decisional law of [New York] does not attach to every act, but when official action involves the exercise of discretion or expert judgment in policy matters, and is not exclusively ministerial, a municipal defendant" has immunity from suits for damages claimed from "the injurious consequences of that action" (*Haddock*, 75 NY2d at 484 [1990]).

In short, the District Court failed to examine the specific act or omission out of which the injury is claimed to have arisen and the capacity in which that act or failure to act occurred, along with the costs involved in performing those acts and in doing so, incorrectly held that the Agency Defendants do not have governmental immunity from this suit.

**2. The Agency Defendants are entitled to immunity under the governmental proprietary function test.**

In this action, Plaintiff claims she was injured because the Agency Defendants disregarded the health, safety, and welfare of Plaintiff and the public in general when

they failed to install billions-of-dollars of technology into its legacy subway system that would prevent the public from tripping or falling onto the tracks or by being [criminally] pushed onto the tracks.

Initially, installing and maintaining billions of dollars of PSDs and TIDS technology is not necessary to operate subways. Regardless, the Agency Defendants demonstrated that they evaluated the effectiveness and feasibility of installing platform barriers and TIDS to promote, among other things, public safety and the subway system's security. This includes evaluating the dangers that PSDs themselves present to the public at large (*See Farber v. New York City Trans. Auth.*, 143 A.D.2d 112 [2 Dept 1988][not completely locking a closed token booth area that allegedly facilitated an assault involves a governmental function]; *Bonner v. City of New York*, 73 N.Y.2d 930 [1989] [maintenance and operation of Port Authority Bus Terminal is governmental not proprietary function]; *County of Westchester v. Vil. of Mamaroneck*, 41 Misc.2d 811 [1964], *aff'd* 22 A.D.2d 143 [2 Dept. 1965][county's reconstruction of sanitary sewer treatment plant was a governmental function]).

The Agency Defendants also assessed the costs of installing and maintaining PSDs (and TIDS) in the limited number of stations where it was considered feasible. The cost to install PSDs at such feasible stations exceeded $7 billion, along with $119 million in annual maintenance costs (*See e.g., CBS Outdoor Inc. v City of New York*, 50 Misc.3d 283, 295 [Sup Ct, NY County 2015]["[I]t is as true today as when



4932-7183-0373v.2

the MTA and its predecessors were created that the adequate funding of essential commuter service - - which the legislature declared a public interest of the state and its political subdivisions - - remains a pressing problem with no clear solution.”]).

The combination of the safety and security elements of PSDs and TIDS, along with the *significant* capital investment and annual maintenance, tips the scales towards a governmental function (*See e.g., McCrae v New York City Tr. Auth*, 123 A.D.3d 598 [1 Dept 2014] [considerations include whether the issues “require[d] the expenditure of substantial sums on capital improvements”]; *compare Calabrese v City of Albany*, 43 N.Y.3d 167 [NY 2024][defendant’s repair of the excavation on the street where the accident occurred was a proprietary function]; *Jourdain v Metropolitan Transp. Auth.*, 219 A.D.3d 876 [2 Dept 2023][maintaining a tree a proprietary function]). Accordingly, the Agency Defendants are entitled to governmental immunity.

### D. The Agency Defendants are entitled to qualified immunity.

If this Court determines the District Court’s assessment of the issues alleged in this matter fits squarely into a proprietary role - - which it should not - - the District Court failed to properly consider Defendants-Appellants’ 20-plus-years of studying platform safety and improperly relied on plaintiff’s expert as a basis for finding a triable issue of fact.

“Lawfully authorized planning by governmental bodies has a unique character

deserving of special treatment . . . " (*Weiss*, 7 N.Y.2d at 585) and cannot be usurped by a mere difference of opinions. Yet, that is what the District Court has done here by denying the Agency Defendants' motion for summary judgment.

The District Court improperly relied on plaintiff's expert, who attested to purported reasonable safety studies pursuant to undefined industry standards,[7] to determine the existence of an issue of fact regarding whether the decision not to install PSDs and TIDS at the subject station had a reasonable basis (*See Van De Bogart v. State*, 133 A.D.2d 974, 976 [3 Dept 1987]["while claimant's expert disagreed with the conclusion of the State's [] engineers, such judgmental decisions are precisely the kind which are clothed with qualified governmental immunity under *Weiss v. Fote*"]). The District Court even held that "credibility assessments of experts 'are matters for the jury'" (Dec at 9).

While the Agency Defendants agree that credibility determinations are

---

[7] Despite Plaintiff's claims, the case law does not require a "safety study" or <u>any</u> formal study to obtain qualified immunity (*See McCord v City of New York*, 298 A.D.2d 438, 439 [2 Dept 2002][NYCTA was entitled to qualified immunity based on its decision to lock the doors on its longer subway cars because it was reasonably based on passenger safety since the cars pose a greater risk to passengers moving from car to car]; *Zambrana v New York City Tr. Auth.*, 14 A.D.3d 23 [1 Dept 2004]["a conscious decision on the part of TA to keep car doors unlocked and to afford a ready means of escape is a valid governmental policy choice concerning the dangers posed to riders who might become trapped below ground as the result of a mishap, as opposed to the danger that a passenger might be injured as a result of voluntarily moving between cars . . . [and therefore the] decision is protected by the doctrine of governmental qualified immunity"]). Instead, "to establish entitlement to qualified immunity, the governmental body must demonstrate 'that the relevant discretionary determination was the result of a deliberative decision-making process'" (*Ramirez v State of New York*, 143 A.D.3d 880 [2 Dept 2016][citations omitted]; *see also Heins v Vanbourgondien*, 180 A.D.3d 1019 [2 Dept 2020]["The relevant discretionary determination resulted from a "deliberative decision-making process"]).

typically for the jury to decide, "something more than a choice between conflicting opinions of experts is required before a governmental body may be held liable for negligently performing its [ ] planning functions. ***The plaintiff must show not merely that another option was available but also that the plan adopted lacked a reasonable basis.***" (*Affleck v. Buckley*, 96 N.Y.2d 553, 557 [2001] [emphasis added]; *see also Enker v. Cnty of Sullivan*, 162 A.D.3d 1366, 1368 [3 Dept 2018] [plaintiff's expert affidavit "which merely shows that another option was available, does not itself raise a triable issue of fact"]; *Harford v. City of New York*, 194 A.D.2d 519, 520 [2 Dept 1993] ["The plaintiff contends that the testimony of his expert in transportation engineering at least created issues of fact for the jury to determine. This is precisely the situation where *Weiss* controls and does not allow a battle of the experts."]).

The District Court pointed to the rejection of an "offer" by Seoul Metropolitan Rapid Transit Corp. Authority to "install PSDs under a 30-year Build-Operate-Transfer "BOT") agreement in New York" in exchange for certain advertising rights as an issue for a jury while determining whether the decision had a reasonable basis (*Id.*). However, even if this unsolicited offer (that is not disputed was made) was a firm, valid, and unconditional guarantee that PSDs could and would be installed at no cost, it ***is not material*** to whether the Agency Defendants are entitled to qualified immunity and certainly not an issue for jury determination.

Preliminarily, the BOT proposal is immaterial because it *did not include* installing PSDs at the subject-station. In other words, there is *no* causal link between the Agency Defendants' rejection of the BOT proposal and Plaintiff's accident.

Regardless, the threshold issue of immunity focuses on whether the Agency Defendants' decision was the product of a study or investigation made by a duly authorized planning body (*See Weiss*, 7 N.Y.2d at 588). Once a defendant establishes it studied the issue, it will only be liable if the plaintiff can demonstrate the study was "plainly inadequate or there is no reasonable basis for its [] plan" (*Affleck*, 96 N.Y.2d at 556). However, "plainly inadequate" does not mean that the jury gets to second-guess the decision of the duly authorized public planning body.

> To accept a jury's verdict as to the reasonableness and safety of a plan of governmental services and prefer it over the judgment of the governmental body which originally considered and passed on the matter would be to obstruct normal governmental operations and to place in inexpert hands what the Legislature has seen fit to entrust to experts.

(*Weiss*, 7 N.Y.2d at 585-86; *see also Harlow v. Fitsgerald*, 457 U.S. 800, 813 [1982] ["public policy at least mandates an application of the qualified immunity standard that would permit the defeat of insubstantial claims without resort to trial"]).

Indeed, a policy decision has a reasonable basis if it is not irrational (*See McCormack v. City of New York*, 80 N.Y.2d 808 [1992] [qualified immunity for choice of bullet proof vest where such choice is not irrational]) or arbitrary.

Therefore, the Court's function, in deciding whether a study was "plainly

inadequate" or whether there was no reasonable basis for its plan does not require it to "go behind the ordinary performance of planning functions by the officials to whom those functions were entrusted" (*Weiss*, 7 N.Y.2d at 584; *see also Riddell v City of New York*, 209 A.D.3d 891 [2 Dept 2022]["defendants met their burden of establishing, prima facie, that they were entitled to qualified immunity from liability by submitting evidence that the traffic plan for that area neither evolved without adequate study nor lacked a reasonable basis"]). In essence, "the judgment of the governmental body which originally considered and passed on the matter" is entitled to some deference (*See id*.; *see also e.g., Malley v Briggs*, 475 U.S. 335, 341 [1986] ["qualified immunity protects all but the plainly incompetent or those who knowingly violate the law"]). Indeed, the Agency Defendants' decision, "absent some indication that due care was not exercised in the preparation of the design or that no reasonable official could have adopted it" (*Weiss*, 7 N.Y.2d at 586), *is not* to be left in the hands of a jury.

As the Court of Appeals further explained:

> To accept a jury's verdict as to the reasonableness and safety of a plan of governmental services and prefer it over the judgment of the governmental body which originally considered and passed on the matter *would be to obstruct normal governmental operations and to place in inexpert hands what the Legislature has seen fit to entrust to experts***.**

(*Weiss*, 7 N.Y.2d at 585-86 [emphasis added].) In short, "[q]ualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments,'

and '*protects all but the plainly incompetent*. . . .;'" (*Messerschmidt v. Millender*, 565 U.S. 535, 546 [2012] [emphasis added], *quoting Ashcroft v Kidd*, 563 U.S. 731, 743 [2011]).

To hold otherwise would allow a jury to dictate how the Agency Defendants, despite exercising their professional judgment, prioritize projects and spend limited funds or face the continued assault of lawsuits, which would "constitute the type of judgment substitution that *Weiss* prohibits" (*Friedman*, 67 N.Y.2d at 285-6; *see also Edouard v Bonner*, 224 A.D.2d 575, 577 [2 Dept 1996]["City produced sufficient evidence to establish that it made a legitimate ordering of priorities based on available funding."]).

Yet, the District Court denied the motion despite the clear evidence in the record that the decision *not* to install PSDs was the product of Agency Defendants' study of the issue (*See Weiss*, 7 N.Y.2d at 588; *see also Selca v. City of Peekskill*, 78 A.D.3d 1160 [2 Dept 2010]). Indeed, the Agency Defendants' study of the issue was so extensive that it: spanned over two decades; involved multiple international trips by executive members of the operational team to assess PSDs and TIDS utilized in foreign countries; included the retention of an outside consulting company to assess the feasibility of retrofitting the technologies into the over century old system; considered proposals by contractors and foreign transportation systems to install PSDs; involved pilot programs to test the new technologies, and considered the



4932-7183-0373v.2

hazards these new technologies would introduce to the system. (App. at 121-2, 136-140, and 142-144; *see also supra* at p. 7-8).

Therefore, the *only* question the District Court should have considered, without relying on Plaintiff's hired expert, is whether the Agency Defendants' study of PSDs and TIDS was "plainly inadequate or [whether] there [was] no basis for its [ ] plan" (*Affleck*, 96 N.Y.2d at 556). Indeed, as the Supreme Court observed in *Saucier v. Katz* (533 U.S. 194 [2001]), "the approach the Court of Appeals adopted - - to deny summary judgment any time a material issue of fact remains . . . could undermine the goal of qualified immunity to 'avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment'" (*Id*. at 202, *citing Harlow v. Fitzgerald*, 457 U. S. 800, 818 [1982]).

The New York Court of Appeals has consistently supported this interpretation. For example, in *Friedman*, *supra*, the Court held that a municipality's duty to keep its streets in a reasonably safe condition "is measured by the courts with consideration given to the proper limits on intrusion into the municipality's planning and decision-making functions" (67 N.Y.2d at 283; *see also Vays v. County of Orange*, 214 A.D.3d 689, 690-1 [2 Dept 2023]["the rail was designed pursuant to the standards set forth by the [NYSDOT], which were the result of a deliberative decision-making process of the type afforded immunity from judicial interference"]; *Rodriguez v. Palacio*, 199 A.D.3d 728 [2 Dept 2021]["the geometry of the [ramp]

had been analyzed by engineers with the [NYCDOT] in connection with a 1998 study to improve safety on the [ramp]; *Lewis v. City of New York*, 131 A.D.3d 1134, 1135 [2 Dept 2015] ["The City's decision-making process . . . was not irrational or arbitrary."]; *Byrne v. City of New York*, 17 Misc.3d 1101(A)[Richmond Sup. Ct. 2007][City's presented sufficient evidence that its decision was neither unreasonable nor inadequate"].

Here, the Agency Defendants presented ample evidence establishing it studied platform screen doors and track intrusion devices and passed on the matter for a myriad of reasons. Plaintiff's expert's opinion is not enough to send this matter to a jury to have them substitute their judgment for that of the Agency Defendnats' professionals. Accordingly, the Agency Defendants are entitled to qualified immunity (*See Selca*, 78 A.D.3d at 1161 ["the defendants demonstrated, [its] design [. . . ] was adopted after adequate study and that there was a reasonable basis for that plan"].

## CONCLUSION

For the reasons fully set forth above, it is respectfully requested that this Court reverse the District Court's order and grant Defendants-Appellants motion for

summary judgment as to governmental immunity and/or qualified immunity, and grant such other and further relief as this Court may deem just and proper.

Dated: September 5, 2025
New York, NY

Respectfully submitted,

LANDMAN CORSI BALLAINE & FORD P.C.

By: ______________________

Andrew P. Keaveney
Timothy Collazzi
Attorneys for Defendants-Appellants
120 Broadway 13th Floor
New York, New York 10271
(212) 238-4800

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4) (A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 6,805 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated: New York, New York
September 5, 2025