# No. 25-0727

*In the*

United States Court of Appeals

*for the*

Second Circuit

LUISA JANSSEN HARGER DA SILVA,
*Plaintiff-Appellee,*

– v. –

NEW YORK CITY TRANSIT AUTHORITY, METROPOLITAN TRANSPORTATION AUTHORITY, RAQIA SHABAZZ,
*Defendants-Appellants,*

On Appeal from the United States District Court
for the Eastern District of New York
Case No. 17-cv-4550, Hon. Frederick Block

**RESPONSE BRIEF FOR APPELLEE**

ELLIOT DOLBY SHIELDS
DAVID A. ROTH
*Roth & Roth LLP*
*192 Lexington Ave., Suite 802*
*New York, NY 10016*
*(212) 425-1020*

ROBERT J. GENIS
*Sonin & Genis, Esqs.*
*One Fordham Plaza - Suite 907*
*Bronx, New York 10458*
*(718) 561-4444*

*Counsel for Plaintiff-Appellee Luisa Janssen Harger Da Silva*

TABLE OF CONTENTS


INTRODUCTION ........................................................................................ 1

FACTUAL AND PROCEDURAL HISTORY................................................ 3

I. BACKGROUND OF CLAIMS AND SUMMARY JUDGMENT DECISION ........................................................................................ 3

II. ADDITIONAL SUMMARY JUDGMENT SUBMISSIONS THAT INDEPENDENTLY CREATE QUESTIONS OF FACT FOR TRIAL ON APPELLANTS' STATE LAW QUALIFIED IMMUNITY DEFENSE ...... 6

A. Appellants Violated Their Own Mandated System Safety Program Plan ("SSPP")........................................................................................ 6

B. The Declaration of Carl Berkowitz, Ph.D., P.E., AICP and his expert report ........................................................................................ 7

C. The summary judgment record included testimony from multiple TA witnesses that established no study was ever performed about how to prevent the hazard of trains striking people. .................................... 8

D. Even if a study was performed, it was inadequate ........................ 11

E. The Transit Authority's ostensible plan to only utilize a public awareness campaign to address the known frequent catastrophic hazard of train strikes as of August 2, 2016, lacked a reasonable basis 12

F. As of August 2, 2016, the TA failed to regularly review its decision in light of actual operations ............................................................... 14

III. The summary judgment record SHOWS THAT that the ta issued a request for information (RFI) for system wide installation of platform screen doors, received numerous responses FROM COMPANIES THAT SAID THEY COULD INSTALL PSDs AT ZERO COST TO THE TRANSIT AUTHORITY, and then abandoned the project wihtout explanation ........................................................................................ 15

A. RFI #10RFIN44........................................................................ 15

B. Seoul Metropolitan Rapid Transit response to RFI ....................... 16

C. Faiveley response to RFI ............................................................ 17

D. Appellants' evaluation of 12 RFI responses .................................. 17

IV. FOUR DAYS AFTER APPELLEE FILED HER SUMMARY JUDGMENT OPPOSITION, APPELLANTS BEGAN INSTALLING PLATFORM BARRIERS (FIXED GUARDRAILS) RECOMMENDED BY APPELLEE'S EXPERT CARL BERKOWITZ—WHICH APPELLANTS CLAIMED IN THEIR SUMMARY JUDGMENT SUBMISSIONS WERE INFEASIBLE AND TOO HAZARDOUS TO INSTALL .......................... 18

V. PROCEDURAL HISTORY .............................................................. 21

SUMMARY OF THE ARGUMENT ........................................................... 24

I. THE APPEAL IS JURISDICTIONALLY BARRED.......................... 24

A. There is no appealable final judgment. ......................................... 24

B. The Collateral Order Doctrine Does Not Apply Here Because New York Immunities Are Defenses to Liability, Not Immunity from Suit 24

II. Should the Court reach the merits, APPELLANTS are not entitled to GOVERNMENTAL OR qualified immunity ............................................ 26

A. The Governmental Function Immunity Claim Is Foreclosed by Over a Century of Settled Law ............................................................ 26

B. Appellants Own Witnesses Doom Their Qualified Immunity Defense................................................................................................. 28

Standard of Review.................................................................................. 30

Argument .................................................................................................. 31

I. Denial of Summary Judgment on State-Law Immunity Defenses Is Not Immediately Appealable. ................................................................. 31

A. Governmental and qualified immunities are defenses to liability, not immunities from suit. ................................................................. 31

B. The presence of fact disputes forecloses interlocutory review....... 33

C. Orders denying state-law immunity are reviewable after final judgment. .............................................................................................. 34

II. The District Court Correctly Held That Subway Operation Is a Proprietary Function AND DENIED APPELLANTS' SUMMARY JUDGMENT MOTION ON THE BASIS OF GOVERNMENTAL IMMUNITY.......................................................................................... 34

A. The District Court correctly held that operation of the subway is a proprietary function. .......................................................................... 34

B. Appellants' reliance on *Haddock v City of New York* is misplaced: Appellants failed to exercise discretion because they failed to comply with their own System Safety Program Plan or the Required Hazard Analysis........ 40

B. Appellants omit Da Silva's arguments that if PSDs were infeasible, then Appellants had to take other remedial measures like installation of fixed guardrails. ........ 41

III. Appellants Are Not Entitled to Qualified Immunity. ........ 43

A. Legal Standard........ 43

B. Whether There Was an Adequate Study and a Reasonable Safety Plan Was for the Jury. ........ 44

C. Appellants' Claim that No Formal Study is Required to Demonstrate Entitlement to Qualified Immunity Misstates the Law. 45

G. Post-Incident Barrier Installations Undercut Appellants' Infeasibility Claims and Confirm the Absence of Any Reasoned, Hazard-Specific Study........ 53

Conclusion ........ 55

TABLE OF AUTHORITIES

**Cases**

*Affleck v. Buckley*, 96 N.Y.2d 553, 558 (2001) ................................ 43, 52, 54
Almonte v. Averna Vision & Robotics, Inc., 128 F. Supp. 3d 729, 751 n.15 (W.D.N.Y. 2015) ........................................................................ 21, 43
*Applewhite v. Accuhealth, Inc.*, 21 N.Y.3d 420, 425 (2013) ....................... 35
*Bellinger v. Deere & Co.*, 881 F. Supp. 813, 818–19 (N.D.N.Y. 1995) .. 21, 43
*Bolmer v. Oliveira,* 594 F.3d 134 (2d Cir. 2010)......................................... 32
*Bonner v. City of New York,* 73 N.Y.2d 930 (1989) .................................... 27
Brown v. State, 89 N.Y.2d 172, 192 (1996).................................................. 25
*Catlin v. United States*, 324 U.S. 229, 233 (1945)....................................... 24
*Catlin v. United States*, 324 U.S. 229, 233 (1945) ...................................... 25
*Clinger v. N.Y.C. Transit Auth.*, 85 N.Y.2d 957, 959 (1995)................. 26, 36
*Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)... 24, 25, 34
*Crosland v New York City Tr. Auth.*, 110 AD2d 148 [2d Dept 1985], *affd* 68 NY2d 165 [1986] ........................................................................... 27
*Crosland v. New York City Transit Authority*, 68 N.Y.2d 165 (1986)........ 36
*DeLeon v New York City Tr. Auth.*, 305 AD2d 227, 228 [2003].................. 46
*Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 875 (1994) 32, 34
*Farber v. New York City Transit Authority,* 143 A.D.2d 112 (2d Dept 1998) ............................................................................................... 27
*Giske v. State*, 191 A.D.2d 675, 676 (2d Dept 1993)................................... 52
*Haddock v. City of New York*, 75 N.Y.2d 478 (1990).................................. 40
*Heins v Vanbourgondien*, 180 A.D.3d 1019 [2 Dept 2020] ................... 45, 47
*In re Merrill Lynch Auction Rate Sec. Litig.*, 851 F. Supp. 2d 512, 521 (S.D.N.Y. 2012), *aff'd sub nom. Louisiana Pac. Corp. v. Merrill Lynch & Co.*, 571 F. App'x 8 (2d Cir. 2014) ......................................................... 20
*In re World Trade Center Disaster Site Litigation*, 521 F.3d 169, 181 (2d Cir. 2008)..........................................................................................passim
*In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d 169, 175, 181–83 (2d Cir. 2008).............................................................................................. 31
*Johnson v. Jones*, 515 U.S. 304, 313, 319–20 (1995) ..........................passim
*LeChase Constr. Servs., LLC v. Argonaut Ins. Co.*, 63 F.4th 160, 171 (2d Cir. 2023)............................................................................................... 30
*Lee v. Springer Nature Am., Inc.*, 769 F. Supp. 3d 234, 247 (S.D.N.Y. 2025) ............................................................................................... 21
*Linton v. Zorn*, 135 F.4th 19, 30 (2d Cir. 2025).......................................... 31
*Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir.2006)........................ 1

*Martinez v. N.Y.C. Transit Auth.*, 2025 WL 656394, at *5 (N.Y. Sup. Ct. Feb. 28, 2025) .......... 26
*Martinez v. N.Y.C. Transit Auth.*, 203 A.D.3d 87, 93 (1st Dep't 2022) passim
M*artinez v. New York City Transit Auth.*, 203 A.D.3d 87, 93–95 (1st Dep't 2022) .......... 35, 45
*Matter of Bd. of R.T. R.R. Comm'rs. of N.Y.C.*, 197 N.Y. 81, 96 (1909) 2, 26, 36
*Matter of World Trade Center Bombing Litigation*, 17 N.Y.3d 428, 447 (2011) .......... 35
McClellan v. Smith, 439 F.3d 137, 144 (2d Cir. 2006) .......... 6
*McCord v City of New York*, 298 A.D.2d 438, 439 [2 Dept 2002] .......... 45, 46
*Miller v. State,* 62 N.Y.2d 506 (1984) .......... 38
*Mitchell v. Forsyth*, 472 U.S. 511, 526–27 (1985) .......... 25, 32, 34
*New York & Queens Electric Light & Power Co. v. City of New York*, 221 A.D. 544, 544 (1st Dep't 1927) .......... 36
*Pedraza v. N.Y.C. Transit Auth.*, 203 A.D.3d 95, 105 (1st Dep't 2022) .......... 26, 35, 36, 45
*Ramirez v State of New York*, 143 A.D.3d 880 [2 Dept 2016] .......... 45, 47
*Riddell v. City of New York*, 209 A.D.3d 891, 892 (2d Dep't 2022) .......... 29
*Salim v. Proulx*, 93 F.3d 86 (2d Cir. 1996) .......... 29
*Turturro v. City of New York*, 28 N.Y.3d 469, 480 (2016) .......... passim
*United States v. Ruiz*, 536 U.S. 622, 628 (2002) .......... 30
*Vasquez v. Maloney*, 990 F.3d 232, 237 (2d Cir. 2021) .......... 31
*Weiner v. Metropolitan Transp. Auth.*, 55 N.Y.2d 175, 182 (1982) .......... 37
*Weiss v. Fote*, 7 N.Y.2d 579, 585–89 (1960) .......... passim
*Zambrana v New York City Tr. Auth.*, 14 A.D.3d 23 [1 Dept 2004] .......... 45, 46

**Statutes**

28 U.S.C. § 1291 .......... 24, 32
42 U.S.C. § 1983 .......... 33

**Other Authorities**

Governor Hochul Announces MTA Has Installed Protective Platform Barriers at Over 50 Subway Stations (MTA Press Release, July 18, 2025), available at https://www.mta.info/press-release/icymi-governor-hochul-announces-metropolitan-transportation-authority-has-installed .......... 21

**Rules**

Fed. R. App. P. 30(b)(2) .......... 31
Fed. R. Civ. P. 54(b) .......... 25

Fed. R. Evid. 201(b) .......................................................................... 21
Fed. R. Evid. 407.......................................................................... 22, 43

**Regulations**

49 C.F.R. Part 659 .......................................................................... 6

## INTRODUCTION

Defendant-Appellants Metropolitan Transportation Authority and New York City Transit Authority (the "TA" or "Appellants")'s appeal of the District Court's order denying their motion for summary judgment based on their claimed New York State affirmative defenses of absolute governmental immunity and qualified immunity must be denied because the appeal is jurisdictionally defective, the appeal lacks merit, and Appellants can appeal the trial verdict.

After this Court denied Appellants' emergency motion to stay the trial (Dkt. No. 33.1), Plaintiff-Appellee Luisa Janssen Harger Da Silva ("Appellee" or "Ms. Da Silva") won a 100 % liability verdict against Defendants—the Jury Apportioned liability 99.99 percent against the TA and 0.01 % against the train driver. The jury resolved the factual issue with respect to TA's claimed affirmative defense of qualified immunity in Ms. Da Silva's favor. Specifically, the jury answered the dispositive special interrogatory—"As of August 2, 2016, did the Transit Authority study the issue of persons falling on the tracks and being struck by trains"—in the negative. See, Verdict Sheet. District Court Docket No. 344[1].

The Court should dismiss the appeal for lack of jurisdiction. As this Court held in its order denying the TA's emergency motion to stay the trial,

> We deny the motion for a stay pending appeal primarily because Appellants have not made a strong showing that this Court has appellate jurisdiction over the interlocutory order they seek to appeal, and, absent

[1] The Plaintiff respectfully request that this Court take judicial notice of those records contained in the District Court's docket, as "docket sheets are public records of which the court c[an] take judicial notice." *Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir.2006).

> appellate jurisdiction, they cannot establish a likelihood of success on the merits at this juncture. See *In re World Trade Center Disaster Site Litigation*, 521 F.3d 169, 181 (2d Cir. 2008) (explaining that New York "disfavors immunities from suit," and when motions premised on immunity from liability (as opposed to immunity from suit) are denied, "[d]efendants cannot appeal the denial of those immunities prior to final judgment").

Dkt. 33.1 at 1-2.

Even if not jurisdictionally barred, the appeal of the governmental and qualified immunity denials still fails. The District Court properly denied Appellants' governmental immunity defense because 115 years of unbroken New York precedent confirms that design, maintenance and operation of the NYC subway system is a proprietary function, not a governmental function. *See Matter of Bd. of R.T. R.R. Comm'rs. of N.Y.C.*, 197 N.Y. 81, 96 (1909) ("The construction and operation of a subway is not a street use, but a business enterprise."); *Martinez v. N.Y.C. Transit Auth.*, 203 A.D.3d 87, 93 (1st Dep't 2022) ("NYCTA's function as operator of the subway system is proprietary"). Their appeal of the denial of their governmental immunity defense is completely frivolous as it is foreclosed by over 115 years of unbroken precedent.

The District Court properly denied Appellants' qualified immunity defense because it rested on contested factual disputes. *Johnson v. Jones*, 515 U.S. 304, 313, 319–20 (1995), forbids interlocutory review where the denial of immunity rests on evidentiary sufficiency or factual disputes. Here, the District Court identified triable questions of fact central to any immunity claim under New York law,

including whether the TA conducted an adequate safety study to alleviate the known and recurring hazard of trains striking people, resulting in fatalities and catastrophic injuries 3-5 times per week; what if any safety measures were implemented; whether any resulting plan had a rational basis; whether that plan was reviewed in light of its actual operation, and whether there was an unjustifiable delay in implementing a remedial corrective action plan —precisely the predicates requires under *Weiss v. Fote*, 7 N.Y.2d 579, 585–89 (1960) and *Turturro v. City of New York*, 28 N.Y.3d 469, 480 (2016). These are jury issues, not "pure law," and *Johnson* prohibits reweighing them on interlocutory appeal.

In their brief, the TA does not even claim they conducted a "study" prior to Ms. Da Silva's accident on August 2, 2016. In fact, the only alleged "studies" they cite to concern the feasibility of installing Platform Screen Doors ("PSDs") and Track Intrusion Detection Systems ("TIDS")(neglecting the study of other effective safety devices); however, these supposed feasibility "studies" occurred years after Ms. Da Silva's accident and are irrelevant to determining the TA's entitlement to immunity. For these reasons and the reasons detailed below, this Court should dismiss the appeal for lack of jurisdiction, or alternatively, deny the appeal on the merits.

## FACTUAL AND PROCEDURAL HISTORY

### I. BACKGROUND OF CLAIMS AND SUMMARY JUDGMENT DECISION

On August 2, 2016, Luissa Harger Janssen Da Silva—a 21-year-old architectural student vising from Brazil—fainted and fell onto the subway tracks

at the Atlantic Avenue, Barclays Center Station. When she fell, the train had not yet entered the station. She was on the tracks for approximately 40 seconds before she was run over by a train that was operated by Defendant Raqia Shabazz—severing her left arm above the elbow and left leg above the knee.

Da Silva brought suit in the Eastern District of New York under diversity jurisdiction, alleging, *inter alia*, that the TA breached its nondelegable duty to design and maintain the subway platform in a reasonably safe condition, and alleviate the danger of trains striking people, including by: (1) failing to install any protective platform edge barriers to prevent people from falling onto the tracks, such as Platform Screen Doors ("PSDs") [also known as "full height" PSDs]), Platform Edge Gates ("PEGs") [also known as "half height" PSDs or Automatic Platform Gates ("APG"s, Rope Platform Screen Doors ("RPSDs"), or fixed guardrails (all collectively referred to as "platform barriers"); and/or (2) by failing to install warning devices designed to stop the train once a sensor detects a body on the subway train tracks, such as "Track Intrusion Detection Systems" ("TIDS[2]").

On March 1, 2024, the parties filed the fully bundled motion for summary judgment. On March 6, 2025, Judge Block denied Appellants' motion for summary judgment as to negligence and the immunity defenses, holding that subway operation is a proprietary function and that genuine issues of fact precluded summary judgment based on qualified immunity. Dkt. 24.1 at 150-154, *Da Silva v.*

[2] TIDS includes CCTV cameras, Video feed to train operator, Front facing cameras, detection mats, laser detection, thermal detection, radar detection.

*N.Y.C. Transit Auth.*, No. 17-CV-4550 (FB)(VMS), 2025 WL 946598 (E.D.N.Y. Mar. 6, 2025).

Judge Block held that operating the subway system is a "traditionally private enterprises" and therefore constitutes a proprietary, not governmental, activity, citing *Turturro v. City of New York*, 28 N.Y.3d 469 (2016) and *Applewhite v. Accuhealth*, 21 N.Y.3d 420 (2013). Dkt. 24.1 at 150-154. He further found that the TA was not entitled to qualified immunity because the record contained conflicting evidence about whether their decisions regarding platform-edge safety "evolved following adequate studies and had a reasonable basis." Dkt. 24.1 at 152-154. The court specifically cited the declaration of the TA's Ahmad Abdallah (Dkt 24.1 at 118-144), which claimed that the TA performed international research and safety analyses, contrasted with the declaration (SA -193221) and report (SA 88-192) of Plaintiff's expert, Dr. Carl Berkowitz, which opined the TA's cited materials did not meet mass transit and professional engineering standards, and did not constitute true safety studies. Dkt 2 at 9.

Judge Block also noted that Da Silva presented additional evidence—such as the Seoul Metropolitan Rapid Transit (SMRT) response to the TA's Request For Information ("RFI") to install PSDs at no cost to the TA (SA 788-845)[3]—that, if credited, would show Appellants rejected feasible safety measures without an adequate basis. Dkt. 24.1 at 153-154. Because these disputes turned on the

[3] The TIS/SMRT response was just one of twelve such responses that offered to install PSDs at no cost to the TA.

credibility of competing experts and factual determinations regarding the existence and adequacy of pre-accident studies, the court ruled that they must be resolved by the jury, citing *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) and *Turturro*, 28 N.Y.3d at 483.

## II. ADDITIONAL SUMMARY JUDGMENT SUBMISSIONS THAT INDEPENDENTLY CREATE QUESTIONS OF FACT FOR TRIAL ON APPELLANTS' STATE LAW QUALIFIED IMMUNITY DEFENSE

In his opinion denying summary judgment, Judge Block only cited a fraction of the summary judgment exabits that demonstrated numerous questions of fact on the TA's claimed qualified immunity. Notably, with their appeal, Appellants improperly filed an incomplete Appendix without consulting Appellees—forcing Appellee to file her own Supplemental Appendix ("SA") that includes key materials the TA omitted, each of which independently demonstrates that questions of fact exist with respect to Appellants' state law qualified immunity defense.

### A. Appellants Violated Their Own Mandated System Safety Program Plan ("SSPP").

The SSPP governs the process for how the NYCTA must identify, analyze, and eliminate safety hazards under U.S. Military Standard 882 ("MIL-STD-882"). (SA 70-87). The TA was required to implement its SSPP pursuant to 49 C.F.R. Part 659 (SA 72). The SSPP incorporates MIL-STD-882's methodology, requiring the TA to identify hazards, assess their probability and severity, implement corrective measures to eliminate or reduce unacceptable risks, and periodically review its plan for effectiveness. (SA 83-86.). Where a hazard is classified as both "frequent"

and "catastrophic", it is categorized as a "Risk Assessment Category 1" ("RAC") and requires immediate corrective action. (SA 86-87).

**B. The Declaration of Carl Berkowitz, Ph.D., P.E., AICP and his expert report**

Dr. Berkowitz's declaration and report confirm that the TA never performed a proper pre-accident safety or feasibility study consistent with its own SSPP, MIL-STD-882, or federal transit-safety standards. Dr. Berkowitz explained that no valid hazard analysis, risk assessment, or corrective-action plan was ever conducted for how to prevent or reduce the known and recurring hazard of train striking people at the Atlantic Avenue–Barclays Center station or system-wide. (SA 195, 197-99, 201-205 [Berkowitz Decl. ¶¶ 5, 10–15, 25–32]) He concluded that the TA's documents and internal correspondence did not constitute "studies" under professional mass transit and engineering standards, because none followed required scientific methodology—no root-cause analysis, no risk quantification, and no comparative evaluation of alternative mitigation measures. (SA 201-205 [¶¶ 25–27, 30–32]; SA 102-103, 105-109 [Berkowitz Report at 15–16, 18–22])

Dr. Berkowitz further opined that feasible engineering controls—whether fixed guardrails, PSDs, rope or half-height platform barriers, and platform-edge gates—were long available and had been successfully implemented in comparable international systems to eliminate or reduce the hazard of train strikes decades before Ms. Da Silva's 2016 injury. (SA 195-197 [¶¶ 6–9]; SA 92-94, 113-115 [Berkowitz Report at pp. 5–7, 26–28]) He concluded that if the TA had performed a proper MIL-STD-882 hazard analysis, it would have identified the hazard of

unprotected platform edges, providing open access to the tracks, the "root cause" of the recurring *RAC-1A catastrophic-frequent hazard* of train striking people, and would have been required to take corrective action—such as installing barriers or other protective devices—to eliminate or reduce the risk. (SA 198-199 [¶¶ 15–16]; SA 102-104) In his professional opinion, the TA's failure to conduct this analysis or implement any of these proven safety measures violated good and accepted mass transit practices, professional engineering standards, federal transit-safety requirements, and the agency's own SSPP.

### C. The summary judgment record included testimony from multiple TA witnesses that established no study was ever performed about how to prevent the hazard of trains striking people.

The summary-judgment record included the deposition transcripts of numerous TA officials and engineers who testified that, as of the date of Ms. Da Silva's accident, the TA never conducted an adequate or proper study—system-wide or station-specific—of how to prevent or reduce the hazard of train strikes:

**TA's Rule 30(b)(6) witness, Eric Jones**: Jones began working at the TA in 1994, and was promoted numerous times, including in 2015 to the Program Manager in the Systems and Security Program of the Capital Program Management Division, where he oversaw all platform safety initiatives. (SA 256-262). Jones confirmed that the TA's Office of System Safety ("OSS") was responsible for applying the MIL-STD-882 process to station-specific hazards, including platform-edge conditions, and that the purpose of platform-edge barriers is to prevent trains from striking passengers (SA 263-265) The SSPP's *Risk Assessment Matrix*

classifies a hazard with "Catastrophic" severity and "Frequent" probability—such as recurring platform falls and train strikes—as RAC-1A, defined as "Unacceptable — Corrective Action Required." (SA 86-87) The SSPP provides that such hazards shall not be accepted by management and must be mitigated through design, procedural, or warning controls.

Despite these written requirements and the known recurrence of train-strike fatalities, Jones admitted that the TA failed to conduct any systemwide or station-specific study of how to best prevent or reduce the number of people being struck by trains, and never implemented a corrective-action plan before Ms. Da Silva's August 2, 2016 injury. (SA 270-272, 281-284, 292) Jones confirmed there were no formal studies to reduce or prevent train strikes systemwide or at the subject station (SA 288-290); no comparative analysis of outcomes if platform edge doors, CCTV, TIDS, were implemented (SA 281-283); and no comprehensive platform-door feasibility study was conducted until after Plaintiff's accident, in 2017–2019. (SA 268).

These admissions, together with the SSPP's own terms, demonstrate that the TA failed to conduct the mandated MIL-STD-882 analysis or adopt any corrective program for an acknowledged RAC-1A hazard despite its adoption of MIL-STD-882 and the frequency of catastrophic injuries.

**Cheryl Kennedy, former Vice President of TA's OSS**: Kennedy confirmed there was no pre-accident study on "how to best prevent or reduce" train strikes either system-wide or at Atlantic Ave–Barclays; no comparison of fatalities or

serious injuries with and without safety devices; and no station-by-station analysis identifying which devices should be installed. (SA 400-401, 406-408). She testified that neither she nor the TA ever performed a valid hazard analysis, feasibility study, or station-specific safety study to prevent the "12-9s" (the TA code for person under a train)], despite decades of data showing over 100 incidents per year and thousands of deaths and catastrophic injuries. (SA 319, 327-332, 387-391, 400, 405-407, 465).

**Thomas Prendergast, former TA President and former head of OSS**: Prendergast testified that "12-9s" were a known catastrophic hazard and that the proper system-safety response required the TA to identify the hazard, collect complete and accurate data, and conduct a thorough, unbiased root-cause analysis. He nonetheless could not recall any formal system-safety study, system-wide or for Atlantic Avenue–Barclays, on how to prevent or reduce "12-9s", and was unaware of any written System Safety Plan addressing "12-9s" at all. (SA 484-489, 496, 504, 507-510, 520).

**Lawrence Reuter, former President of the TA**: Reuter likewise did not recall the TA ever performing a "proper, adequate, professionally compliant" study, consistent with professional standards or Military Standard 882, to determine how best to prevent or reduce "12-9s". (SA 568-569, 591, 594-595).

**Jose Gregory Sanchez, former Principal Engineer in the TA's Capital Program Management (CPM) Division**: Sanchez testified that, according to accepted engineering standards, the TA was required to conduct station-by-

station feasibility and safety studies for its 472 unique stations. He was not aware of any such studies to determine how to prevent or reduce "12-9s", and testified that without such station-specific analysis there is no valid feasibility or safety study at all. (SA 686-688, 726.)

**Michael Sullivan, TA Manager of the Rail Transit Investigations Unit in OSS:** Sullivan was not aware of any TA safety study that analyzed how to prevent "12-9s", what it would take to prevent them, or that it studied the subject Atlantic Terminal, or performed a feasibility study for PSDs or TIDs. (SA 773, 777-778).

Taken together, this testimony shows that NYCTA never performed the hazard-specific study *Weiss* and *Turturro* require.

**D. Even if a study was performed, it was inadequate**

The same witnesses agree that whatever work was done did not satisfy the TA's own standards—or MIL-STD-882's criteria—for an "adequate" study. The TA's safety officials and engineers testified that a valid study must be complete, thorough, accurate, honest, objective, and data-driven; must follow the SSPP/MIL-STD-882 methodology; and must include comparative analysis of safety outcomes before and after mitigation. (SA (Kennedy) 302, 316, 327-340, 447-450, 476-477; (SSPP) 86-87; (Jones) 270-272, 282-284, 292-294; (Prendergast) 487-489, 492-493, 514-515; (Reuter) 572-576, 579-580, 628; (Sanchez) 687-688, 723, 726; (Sullivan) 773, 777).

These TA representatives acknowledged, however, that the TA "did not follow" the MIL-STD-882 methodology; that they never conducted a comparative

analysis that studied the difference between leaving the system as-is versus adding safety devices; that survey-based "Platform Edge Safety Program" efforts were not adequate studies; and that no proper pilot or before-and-after comparative analysis was ever conducted for PSDs or other mitigations. (SA (Kennedy) 401-403, 431-432; (Prendergast) 525-526, 528, 540-541; (Reuter) 574-576, 580, 627; (Sanchez) 687-688, 723; (Sullivan) 773, 777).

On this record, there is no qualifying study for which NYCTA can claim *Weiss* immunity.

### E. The Transit Authority's ostensible plan to only utilize a public awareness campaign to address the known frequent catastrophic hazard of train strikes as of August 2, 2016, lacked a reasonable basis

The testimony also shows that the only mitigation efforts taken by the TA prior to Ms. Da Silva's accident was a "public awareness" campaign, which failed to reduce the number of train strikes. The TA's decision to only engage in the ineffective public awareness campaign was not grounded in data-driven analysis and persisted despite a known RAC-1A hazard and uncontroverted evidence of effective, feasible mitigations; an unjustifiable delay in implementing a remedial corrective action plan. As the only measures taken by the TA over many decades was ineffective in light of the system's actual operation, and no corrective plan was issued, there can be no qualified immunity granted to the TA.

As noted above, under the SSPP, recurring train strikes ("12-9s") due to open access to the tracks, is a Catastrophic/Frequent RAC-1A hazardous condition—explicitly "Unacceptable—Corrective Action Required"—yet was

treated by the TA as acceptable. (SA (SSPP) 86-87, (Jones) 263-265). Witnesses from the TA, however, admitted no or very few fatalities or catastrophic injuries were acceptable to the TA (SA 269-270)

Multiple TA witnesses confirmed that "12-9s" were the leading cause of death and catastrophic injury in the system for decades, with hundreds of incidents annually and thousands of fatalities and maimings. (SA (Kennedy) 319, 327-332; (Sullivan) 741).

Despite the frequency of train strikes and their deadly sequelae, the TA failed to conduct any feasibility or comparative-effectiveness analysis of PSDs, fixed rails, gates, TIDs, CCTV, and did not perform the system wide or station-by-station feasibility and safety studies required by accepted good and accepted mass transit practices and engineering standards. (SA (Kennedy) 387-392, 404-407, 435-453; (Prendergast) 524-526, 532-534; (Reuter) 583-584, 589-590, 593-594, 605-606; (Sanchez) 686-688, 708, 714-717, 721, 726).

The TA's own officials and engineers agreed that PSDs, platform gates, fixed rails, and TIDs are effective at preventing or reducing train strikes and are in widespread use worldwide (i.e., London, Paris, Seoul, JFK), and that its consultants, such as DMJM Harris, had found PSDs feasible and cost-reasonable for the TA. (SA (Kennedy) 347, 359-360, 365, 367-368, 376-377, 474; (Sanchez) 641-643, 648, 655, 665-666, 682-683, 710; (Sullivan) 745-746, 749, 769-770, 781-783; (Reuter) 583-584, 586-590, 597-599).

The evidence shows that PSD pilot projects were repeatedly canceled for political or non-safety reasons—not because a completed hazard analysis found them unsafe or infeasible—even though the TA could have had effective preventative safety devices, PSDs, installed and maintained system-wide at little or no cost in exchange for the installer obtaining the advertising revenue from advertisements placed on the surfaces of the PSDs (SA (Sanchez) 665-666, 672, 675, 691-692, 729, 733-734; (Reuter) 615-616, 618-620, 624-625, 631-634). Considering the RAC-1A classification, the absence of any hazard-specific feasibility or comparative-effectiveness study, and the undisputed effectiveness and feasibility of barriers and TIDs, the "no-barriers/no-TIDs" policy lacked a reasonable safety, mass transit or engineering basis.

### F. As of August 2, 2016, the TA failed to regularly review its decision in light of actual operations

The Record shows that the TA did not comply with its continuing duty to review its plan in light of its actual operation. The only attempted safety measures implemented were an ineffective public awareness campaign—consisting of announcements, signage and yellow tactile strips [mandated by the American Disabilities Act ("ADA") meant for the blind]—which did not reduce train strikes. In fact, the records show that number of train strikes increased in the decade preceding Ms. Da Silva's accident. (SA 897). TA officials testified that the awareness campaigns were conducted because they knew train strikes were a major hazard, yet they were unaware of any analysis of before-and-after data, and they saw no decrease in the number or severity of incidents after these measures.

(SA (Kennedy) 302, 316, 343-347, 349, 351, 412, 415-421; (Prendergast) 513-515, 517; (Reuter) 548-549, 559, 562-563).

Sullivan testified that the TA had data on the number of train strikes before and after the awareness campaigns were implemented but he had "no idea" if anyone ever reviewed it, and that OSS did not use its investigation results to identify causes or to prevent recurrence. (SA 741-742, 752-754, 758-760 ). Jones and Sanchez likewise confirmed there was no MIL-STD-882 hazard analysis, no comparative-effectiveness study of mitigations, and no station-by-station reassessment of platform-edge hazards. (SA (Jones) 270-272, 282-284, 292-294; (Sanchez) 687-688, 701, 726 ). As of August 2, 2016, the TA had not performed any ongoing, data-driven review of the effectiveness (or lack thereof) of its public awareness campaigns that *Weiss* and *Turturro* require as a predicate to qualified immunity.

## III. THE SUMMARY JUDGMENT RECORD SHOWS THAT THAT THE TA ISSUED A REQUEST FOR INFORMATION (RFI) FOR SYSTEM WIDE INSTALLATION OF PLATFORM SCREEN DOORS, RECEIVED NUMEROUS RESPONSES FROM COMPANIES THAT SAID THEY COULD INSTALL PSDS AT ZERO COST TO THE TRANSIT AUTHORITY, AND THEN ABANDONED THE PROJECT WIHTOUT EXPLANATION

### A. RFI #10RFIN44

After receiving a number of unsolicited offers by companies to install PSDs at little or no cost in exchange for advertising revenue obtained from advertisements on the PSDs, in December 2010, the TA issued RFI #10RFIN44 for a "Platform Screen Door/Platform Edge Door/Platform Edge Gate System," inviting firms with proven PSD/PED/PEG experience in large transit systems to

submit information for a system to "enhance passenger safety, comfort and the overall station appearance." (SA 785-787). The RFI specified performance requirements (minimal on-site assembly; dynamic operation with varying train lengths and stop positions; integration with existing signaling, communications, CCTV, and lighting; emergency and maintenance access; reliability in harsh environments; vandal resistance; and no increase in dwell times) and expressly solicited "PSG/PED/PEG Project Financing" proposals, including "design, build-operate-transfer ("BOT") and advertising revenue sharing agreements," with particular interest in "little or no upfront construction costs to NYCT." (SA 786)

### B. Seoul Metropolitan Rapid Transit response to RFI

On March 1, 2011, SMRT/TIS–Halmar–Parsons submitted a turnkey retrofit proposal for existing lines in the New York City Subway System. They cited their retrofit of the subway system in Seoul, South Korea, where they installed PSDs in 148 stations in two years, from 2007 to 2009, and eventually retrofitted all 268 Seoul stations. The proposal offered a BOT financing structure funded by advertising revenue (and proposed to share profits from the advertising revenue with the TA) and requested a Memorandum of Cooperation to proceed with feasibility work, thereby presenting the TA with both concrete engineering and financing pathways years before Ms. Da Silva's injury. (SA 794-795, 812-823, 826-828).

## C. Faiveley response to RFI

Faiveley's submission likewise demonstrated they could meet all technical and engineering challenges and offered to install PSDs systemwide at all 472 stations at no cost to the Transit Authority. Faiveley demonstrated that platform-edge barriers were a mature, field-proven engineering control long before 2016. Its executive summary traced its deployments back to Lille (1989) and Chicago O'Hare (1992) and listed worldwide references totaling more than 153 km of façade and 27,500 door modules—showing technology deployed at scale. Tailored to the TA's 472-station network, the proposal committed to a system adapted to 24-hour operations and New York environmental conditions, offering turnkey design, installation within an operating railway, and optional operation and maintenance services. Faiveley described signaling interfaces and safety loops to ensure "ALL DOORS CLOSED AND LOCKED," compatibility with mixed train lengths, retrofit methods relying on night work and factory pre-assembly, and maintenance practices designed to minimize service disruption. It identified applicable safety and engineering standards, including NFPA 130, EN 50126 (RAMS), EMC and insulation standards, and MIL-HDBK-217F for reliability prediction, confirming that technically sound, standards-based platform-edge barriers were feasible and readily integrable into NYCTA operations. (SA 846-893)

## D. Appellants' evaluation of 12 RFI responses

The TA's Platform Screen Door Task Force Evaluation Summary dated October 6, 2011, shows that the Task Force reviewed twelve responses to RFI

#10RFIN44 and identified five finalists including Faiveley, SMRT/TIS Partners, GE Transportation, KABA Gilgen/Gilgen Door Systems(installed PSDs at JFK Airtrain), and Knorr-Bremse Rail Systems. (SA 894-896). The Task Force found Faiveley's proposal "more impressive" than other Original Equipment Manufacturers ("OEMs") submissions because it engaged in detailed technical analysis of NYCTA's infrastructure challenges—variable door spacing, curved platforms, signal compatibility—and proposed multiple engineering alternatives with clearly stated pros and cons, leading to a recommendation that Faiveley be included in subsequent project discussions. (SA 895)

The Summary described SMRT/TIS Partners' proposal as highlighting SMRT's successful Seoul retrofit and offering a multi-phase BOT structure in which SMRT/TIS would install PSDs at no cost to NYCTA. (SA 895) Both Faiveley and SMRT/TIS were among the final five respondents unanimously recommended for future planning. However, the TA, without explanation, abandoned these proposals, and never advanced the PSD program beyond this 2011 evaluation. (SA 896)

## IV. FOUR DAYS AFTER APPELLEE FILED HER SUMMARY JUDGMENT OPPOSITION, APPELLANTS BEGAN INSTALLING PLATFORM BARRIERS (FIXED GUARDRAILS) RECOMMENDED BY APPELLEE'S EXPERT CARL BERKOWITZ—WHICH APPELLANTS CLAIMED IN THEIR SUMMARY JUDGMENT SUBMISSIONS WERE INFEASIBLE AND TOO HAZARDOUS TO INSTALL

Four days after Plaintiff filed her opposition to summary judgment**,** Appellants began installing fixed platform-edge guardrails, safety barriers that Dr. Berkowitz had identified as feasible corrective measures years earlier. Appellants

claimed in their summary judgment papers that such devices were infeasible and hazardous and could not be installed. Appellants' expert, Kenneth Korach, submitted a declaration in support of their motion for summary judgment in which he declared that fixed rails along platform edges "are considered a serious safety hazard and are never allowed" in U.S. rail transit systems. (SA 233 [¶ 20]) (emphasis added). He asserted that such barriers would create "a very dangerous safety condition" because passengers trapped in closing train doors and dragged along the platform "would likely be severely injured or killed by striking the fixed rail." (*Id.*) Korach further declared that installation of platform edge barriers ("PEBs"), including fixed guardrails, at Atlantic Avenue–Barclays was "not feasible" due to the proximity of support columns to the platform edge, which leaves "insufficient room to install PEBs". (SA 232-234, ¶¶ 19-21).

Corporate representative Ahmad (Tony) Abdallah, similarly controverted feasibility in his November 6, 2023 declaration supporting summary judgment. Abdallah averred that fixed platform barriers created dangerous "minimum distance" entrapment hazards, claiming that "where this 'minimum distance' is exceeded, passengers can become inadvertently trapped between the platform barrier and the train" and that "NYCT's limiting line of line equipment generally exceeds this distance to account for the train's oscillation." (Dkt. 24.1, Abdallah Decl. ¶ 72) He also declared "a fixed barrier on the platform edge could pose hazards to train conductors" because conductors are required to "stick their heads out of the window for the first seventy-five feet of travel after a station stop," and

that adherence to this practice at barrier-equipped stations "would be fatal to any conductor." (Dkt. 24.1, ¶ 73.)

Since January of 2024, the TA has installed fixed platform-edge barriers in 74 subway stations systemwide, with more than 100 stations scheduled for completion by the end of 2025—using the same "fixed rail" design that Appellants' own expert, Kenneth Korach, declared was "never allowed" in U.S. rail transit systems. These barriers were installed at numerous stations in Brooklyn, Manhattan, and Queens, including stations with identical platform geometry and structural constraints to Atlantic Avenue–Barclays.

Governor Kathy Hochul and the MTA publicly announced these installations in July 2025, stating that "the Metropolitan Transportation Authority has installed protective platform barriers at over 50 subway stations," which are "fixed along the platform edge, adjacent to the tactile strip," and were "completed rapidly using in-house labor." *Governor Hochul Announces MTA Has Installed Protective Platform Barriers at Over 50 Subway Stations* (MTA Press Release, July 18, 2025), available at https://www.mta.info/press-release/icymi-governor-hochul-announces-metropolitan-transportation-authority-has-installed.

The Court may take judicial notice of these official government statements and MTA publications under *Fed. R. Evid.* 201(b) and (c). *In re Merrill Lynch Auction Rate Sec. Litig.*, 851 F. Supp. 2d 512, 521 (S.D.N.Y. 2012), *aff'd sub nom. Louisiana Pac. Corp. v. Merrill Lynch & Co.*, 571 F. App'x 8 (2d Cir. 2014)("The Court takes judicial notice of the contents of the SEC Order and the remedial disclosures

Merrill subsequently placed on its website."); *Lee v. Springer Nature Am., Inc.*, 769 F. Supp. 3d 234, 247 (S.D.N.Y. 2025) ("the case law applying Rule 201 states that, for purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and it is capable of accurate and ready determination." [internal quotations and citations omitted]).

The MTA's own public acknowledgment of these installations—occurring within months of Appellants' infeasibility claims—conclusively establishes that the fixed guardrails were, in fact, technically and operationally feasible prior to Appellee's accident, and that Appellants' earlier representations to the contrary lacked any good-faith engineering basis. This subsequent remedial measure is admissible with respect to establishing the feasibility of installing fixed rails, and to impeach the credibility of these adverse witnesses. Fed. R. Evid. 407; *Bellinger v. Deere & Co.*, 881 F. Supp. 813, 818–19 (N.D.N.Y. 1995) (admitting evidence that another model of manufacturer's corn pickers had covered husking box to prove feasibility of such cover on model at issue); *Almonte v. Averna Vision & Robotics, Inc.*, 128 F. Supp. 3d 729, 751 n.15 (W.D.N.Y. 2015) (Rule 407 did not bar evidence of post-accident guarding where offered to show feasibility and feasibility was disputed).

**V. PROCEDURAL HISTORY**

Appellants filed a notice of appeal on May 30, 2025. (2d Cir. Dkt. No. 1.) Appellee then moved in the District Court to certify the appeal as frivolous, which

Judge Block granted on May 29, 2025. (Dkt. No. 18.) The court held that: (1) both New York governmental-function and qualified-immunity doctrines provide only defenses to liability—not immunity from suit—and therefore denials of summary judgment on those defenses are not appealable under the collateral-order doctrine; (2) Appellants' qualified-immunity claim turns on disputed issues of fact; (3) Appellants' governmental-function argument is frivolous, being foreclosed by more than a century of precedent holding that the design, maintenance, and operation of the subway system are proprietary, not governmental, functions; and (4) under the dual-jurisdiction rule, the court retains authority to proceed when an appeal is plainly unauthorized or frivolous. The court further noted that Appellants failed to seek § 1292(b) certification before filing their notice of appeal and that, even if requested, certification would have been denied given the case's length, factual disputes, and settled law precluding immunity. (*Id.*)

Da Silva also filed a motion to dismiss the appeal for lack of jurisdiction. (Dkt. No 14). On July 22, 2025, this Court ordered that the motion to dismiss be referred to the panel that will hear the merits of the appeal. (Dkt. No. 20).

Appellants perfected their appeal on September 5, 2025, (Dkt. No. 24).

On October 3, 2025, appellants moved in the District Court to stay the trial only on Counts 2-3 (the negligent design claims), reasserting their immunity arguments. (ECF No. 267.) The District Court denied this motion on October 7, 2025, three weeks before trial. (Exhibit 3 to appellants' motion at Dkt. No. 28.1)

October 16, 2025, Appellants filed an emergency motion to this Court, which this Court denied, holding:

> We deny the motion for a stay pending appeal primarily because Appellants have not made a strong showing that this Court has appellate jurisdiction over the interlocutory order they seek to appeal, and, absent appellate jurisdiction, they cannot establish a likelihood of success on the merits at this juncture. See *In re World Trade Center Disaster Site Litigation*, 521 F.3d 169, 181 (2d Cir. 2008) (explaining that New York "disfavors immunities from suit," and when motions premised on immunity from liability (as opposed to immunity from suit) are denied, "[d]efendants cannot appeal the denial of those immunities prior to final judgment").

Dkt. 33.1 at 1-2.

A jury trial was held before Judge Frederic Block from October 27, 2025 through November 20, 2025. The jury returned a verdict in Ms. Da Silva's favor, finding the TA was negligent and this negligence was a proximate cause of Da Silva's accident, Defendant Shabazz was negligent and her negligence was a proximate cause of Da Silva's accident, and apportioning liability 99.99 percent against the TA and 0.01 percent against Shabazz. The jury also answered the threshold qualified immunity special interrogatory in the negative: "As of August 2, 2016, did the Transit Authority study the issue of persons falling onto the tracks and being hit by trains?" The jury found that the TA had not met its burden of demonstrating entitlement to qualified immunity.

## SUMMARY OF THE ARGUMENT

## I. THE APPEAL IS JURISDICTIONALLY BARRED

### A. There is no appealable final judgment.

There is no appealable final judgment here. 28 U.S.C. § 1291 grants appellate jurisdiction only over final decisions that "end the litigation on the merits and leave nothing for the court to do but execute the judgment." *Catlin v. United States*, 324 U.S. 229, 233 (1945). The order on appeal denied summary judgment on three counts and granted summary judgment on only one count; it therefore left multiple claims pending against all Appellants. It did not resolve all claims against the New York City Transit Authority, the MTA, or Raquia Shabazz.

Appellants did not seek, and the District Court did not grant, Fed. R. Civ. P. 54(b) certification, so there is no partial final judgment. Denials of summary judgment are generally interlocutory and unappealable, see *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949), and the denial of a defense to liability—as opposed to an immunity from suit—is fully reviewable after final judgment.

Because the District Court's order did not finally dispose of all claims and lacks Rule 54(b) certification, there is no final judgment under 28 U.S.C. § 1291; this Court therefore lacks appellate jurisdiction.

### B. The Collateral Order Doctrine Does Not Apply Here Because New York Immunities Are Defenses to Liability, Not Immunity from Suit

Under the final-judgment rule, interlocutory orders are not appealable unless they fall within a "small class" of collateral orders that conclusively resolve

a true immunity from suit and would be effectively unreviewable on appeal from a final judgment. See *Catlin v. United States*, 324 U.S. 229, 233 (1945) (defining final decisions); *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949) (collateral-order doctrine applies to only a narrow class of decisions); *Mitchell v. Forsyth*, 472 U.S. 511, 526–27 (1985) (immunity from suit is the type of right protected by the collateral-order doctrine).

Appellants assert New York governmental-function immunity and New York qualified immunity, but those doctrines are merely affirmative defenses, not immunities from suit. Because New York's governmental and qualified immunities are defenses to liability—not immunity from suit—the collateral order doctrine does not apply, and this Court lacks jurisdiction over the appeal. This Court has definitively resolved the threshold question: "[D]iscretionary function governmental immunity is merely a defense to liability, rather than an immunity from suit." *In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d 169, 187 (2d Cir. 2008), and New York courts have similarly characterized such defenses as leaving appellants "amenable to suit." *Brown v. State*, 89 N.Y.2d 172, 192 (1996). The qualified immunity doctrine recognized in *Weiss v. Fote*, 7 N.Y.2d 579 (1960), protects only against "liability." *Turturro v. City of New York*, 28 N.Y.3d 469, 479 (2016).

These are affirmative defenses that municipalities must plead and prove—not jurisdictional bars to suit. They do not confer a right to avoid trial and do not meet the "effectively unreviewable" requirement. The District Court's denial of

summary judgment rested on factual disputes about the adequacy of Appellants' purported safety studies and the reasonableness of their decision to continue to use an ineffective public awareness campaign and not implement a corrective action plan. Under *Johnson v. Jones*, 515 U.S. 304, 313, 319–20 (1995), factual disputes preclude interlocutory review of qualified-immunity rulings. Because the order is not a final decision and the asserted defenses are not immunities from suit, the Court lacks jurisdiction and should dismiss the appeal.

## II. SHOULD THE COURT REACH THE MERITS, APPELLANTS ARE NOT ENTITLED TO GOVERNMENTAL OR QUALIFIED IMMUNITY

### A. The Governmental Function Immunity Claim Is Foreclosed by Over a Century of Settled Law

For more than a century, New York courts have uniformly held that the construction, design, and operation of the New York City subway system are proprietary, not governmental, functions. The Court of Appeals first articulated this rule in 1909, holding that "[t]he construction and operation of a subway is not a street use, but a business enterprise," and that classification has never been disturbed. *Matter of Bd. of R.T. R.R. Comm'rs of N.Y.C.*, 197 N.Y. 81, 96 (1909). The Court of Appeals reaffirmed the proprietary nature of subway operations in *Clinger v. N.Y.C. Transit Auth.*, 85 N.Y.2d 957, 959 (1995), and the New York State Supreme Court, Appellate Division, First Judicial Department, did so again in *Martinez v. N.Y.C. Transit Auth.*, 203 A.D.3d 87, 93 (1st Dep't 2022), and *Pedraza v. N.Y.C. Transit Auth.*, 203 A.D.3d 95, 105 (1st Dep't 2022). Most recently, *Martinez v. N.Y.C. Transit Auth.*, 2025 WL 656394, at *5 (N.Y. Sup. Ct. Feb. 28, 2025), rejected

the very argument appellants advance here—that safety and security evidence can somehow convert subway operations into a governmental function—and reaffirmed that NYCTA's function as operator of the subway system is proprietary.

Unable to identify any contrary authority, Appellants invent a "safety-plus-cost" standard that appears nowhere in New York law. They contend that the "combination" of safety and security considerations with high capital and maintenance costs "tips the scales toward a governmental function". Dkt. 25.1 p. 20. But the governing test looks to "the specific act or omission out of which the injury is claimed to have arisen and the capacity in which the act or failure to act occurred." *Turturro v. City of New York*, 28 N.Y.3d 469, 478 (2016)(internal quotations and citations omitted). As explained by the Appellate Division, First Department, in *Pedraza*, claims "arising from ownership and care relating to transportation of passengers, which traditionally has been operated by private enterprise, implicate a proprietary function when performed by a governmental entity (such as the TA)." 203 A.D.3d at 105 (citing *Crosland v New York City Tr. Auth.*, 110 AD2d 148 [2d Dept 1985], *affd,* 68 NY2d 165 [1986]). Appellants' attempt to treat any safety or budget-related decision as "governmental" would erase this distinction and, if accepted, would immunize virtually every negligent design, maintenance, and operations claim involving transit infrastructure—precisely what New York courts have refused to do. Their reliance on *Bonner v. City of New York,* 73 N.Y.2d 930 (1989) and *Farber v. New York City Transit Authority,* 143 A.D.2d 112 (2d Dept 1998) does not salvage this theory: those cases

address discrete policing/security functions, not the core proprietary operation and design of the subway system.

**B. Appellants Own Witnesses Doom Their Qualified Immunity Defense**

New York's qualified-immunity doctrine protects only those governmental planning decisions that satisfy the four *Weiss* and Turturro elements: (1) an adequate study by a duly authorized planning body; (2) a plan with a reasonable basis; (3) review of that plan in light of actual operation; and (4) whether there was an unjustifiable delay in implementing a remedial plan. *Weiss v. Fote*, 7 N.Y.2d 579, 588 (1960); *Turturro v. City of New York*, 28 N.Y.3d 469, 480, 484–86 (2016). The study and plan must address the issue before the jury. *Turturro v. City of New York*, 28 N.Y.3d at 480 ("The immunity arises only where a duly authorized public planning body has entertained and passed on the *very same* question of risk as would ordinarily go to the jury" [internal quotations and citations omitted]).

Appellants' own witnesses foreclose the first element, as they all testified that no study had every been conducted on how to prevent or reduce the number train strikes anywhere in the system, no comparison of fatalities or serious injuries with and without safety devices, no analysis of injury severity where barriers existed versus where they did not, and no analysis identifying which devices should be installed at which stations. See, *supra*, pp. 8-15.

Appellants attempt to fill this gap by invoking generic references to "studying platform barriers and safety technology for over two decades" and by arguing that plaintiff must show any such study was "plainly inadequate." Dkt. 25.1

pp. 25, 26. But *Weiss* and its progeny require a study of the particular hazard—here, people on or near tracks being struck by trains three to five times per week—not high-level or incomplete consideration of barriers in the abstract. The concessions of multiple Transit Authority officials and engineers at their depositions that the TA never performed the required study clearly created fact issues that required denial of summary judgment based on qualified immunity. Because there is no qualifying study, there is nothing for Ms. Da Silva to prove "plainly inadequate," and nothing that can provide a "reasonable basis" for rejecting platform-edge protections or other safety measures like TIDS. See *Riddell v. City of New York*, 209 A.D.3d 891, 892 (2d Dep't 2022). The *Weiss* burden never shifted, because Appellants failed to meet their initial burden to prove an adequate study of the specific hazard at issue.

Appellants' reliance on *Salim v. Proulx*, 93 F.3d 86 (2d Cir. 1996), and their suggestion that they can "concede" certain facts for purposes of appeal do not salvage their position. *Salim* allows an interlocutory appeal where the District Court grants every favorable inference of all facts in favor of the non-movant, but can nonetheless resolve immunity question as a matter of law. It does not permit Appellants to recast the admissions of their witnesses that no study of how to prevent or reduce train strikes was ever conducted as "undisputed", when those admissions themselves show that a required *Weiss* element is entirely missing.

Here, there is no dispute that the Transit Authority never conducted a pre-accident study of how to prevent or reduce the frequent and recurring hazard of

train strikes. The uncontested concessions by the TA's own witnesses defeats qualified immunity on the merits. Even taking all other factual contentions in Appellants' favor, they cannot establish the foundational requirement of a duly authorized, adequate study—so their immunity defense fails as a matter of law.

Finally, the jurisdictional posture underscores why this interlocutory appeal should be dismissed as frivolous. Under *Johnson v. Jones*, 515 U.S. 304, 313–20 (1995), appellate jurisdiction over immunity denials does not extend to fact-bound disputes about what was actually done, and this Circuit applies *Johnson's* limitation to state-law immunity claims. The issues appellants seek to litigate—what, if anything, was studied; whether platform barriers or other safety devices were feasible and reasonably rejected; whether any "plan" existed and was reviewed—are classic factual questions that were properly submitted to the jury.

Under the applicable *de novo* review standards for jurisdiction and state-law immunity, see *In re World Trade Ctr. Disaster Site Litig*., 521 F.3d 169, 175, 181–83 (2d Cir. 2008), the Court should likewise dismiss this appeal for lack of jurisdiction, or in the alternative, affirm the district court's decision denying the Transit Authority's motion for summary judgment.

## STANDARD OF REVIEW

"'[I]t is familiar law that a federal court always has jurisdiction to determine its own jurisdiction.'" *LeChase Constr. Servs., LLC v. Argonaut Ins. Co*., 63 F.4th 160, 171 (2d Cir. 2023) (quoting *United States v. Ruiz*, 536 U.S. 622, 628 (2002)). The Court considers whether subject matter jurisdiction exists de novo. *Id*. In assessing

appealability and any asserted immunity, the Court should note that Appellants' appendix omits core safety-study materials—including the System Safety Program Plan (SSPP) and MIL-STD-882 analyses—while Appellee's Supplemental Appendix supplies these documents. See Fed. R. App. P. 30(b)(2).

The standard of review for the state-law immunity defenses is *de novo*. The Court reviews *de novo* a District Court's disposition of a dispositive motion asserting state-law immunities, and it separately recognizes that state substantive law governs the scope of any immunity, while federal law determines whether a denial is immediately appealable under § 1291. *In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d 169, 175, 181–83 (2d Cir. 2008).

This Court reviews "de novo a district court's determination of qualified immunity insofar as it is a legal issue." *Vasquez v. Maloney*, 990 F.3d 232, 237 (2d Cir. 2021). "When considering qualified immunity at the summary judgment stage, as here, courts must construe all evidence and draw all reasonable inferences in the non-moving party's favor." *Linton v. Zorn*, 135 F.4th 19, 30 (2d Cir. 2025) (quotations omitted).

## ARGUMENT

### I. DENIAL OF SUMMARY JUDGMENT ON STATE-LAW IMMUNITY DEFENSES IS NOT IMMEDIATELY APPEALABLE.

### A. Governmental and qualified immunities are defenses to liability, not immunities from suit.

The collateral-order doctrine permits interlocutory review only where the order conclusively resolves a true immunity from suit whose value would be

irretrievably lost if the case proceeds. *Mitchell v. Forsyth*, 472 U.S. 511, 526–27 (1985). This Court has held that New York's governmental-function and qualified-immunity doctrines "function[] as a defense to liability," not a right to avoid trial; federal law governs appealability under 28 U.S.C. § 1291, and only "explicit statutory and constitutional immunities" qualify for immediate review. *In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d 169, 175, 179, 181–83 (2d Cir. 2008) (quoting *Digital Equip. Corp. v. Desktop Direct, Inc*., 511 U.S. 863, 875 (1994)).

Appellants' reliance on *Bolmer v. Oliveira,* 594 F.3d 134 (2d Cir. 2010) is misplaced. *Bolmer* addresses federal qualified immunity under 42 U.S.C. § 1983 and Eleventh Amendment immunity—paradigmatic immunities from suit—and says nothing about New York's state-law defenses that are judicable after judgment. *Bolmer v. Oliveira*, 594 F.3d 134, 141–42 (2d Cir. 2010). It therefore does not displace *World Trade Center*'s rule that New York's governmental and "qualified" immunities do not satisfy § 1291.

This jurisdictional bar is even clearer where, as here, the District Court's ruling also rests on the presence of material factual disputes about the adequacy of the agency's study and the rational basis of its decision—issues that are nonreviewable on interlocutory appeal. See *Mitchell*, 472 U.S. at 526–27 (distinguishing immunity from suit from mere defenses); cf. *Johnson v. Jones*, 515 U.S. 304, 313, 319–20 (1995) (fact-based qualified-immunity denials are not immediately appealable). The upshot is straightforward: because New York's governmental-function and qualified-immunity doctrines are defenses to liability,

not explicit immunities from suit, § 1291 does not confer jurisdiction to hear this interlocutory appeal.

**B. The presence of fact disputes forecloses interlocutory review.**

Appellants' assert the denial of qualified immunity presents a purely legal question suitable for collateral-order review, and they suggest they can "accept" Appellee's facts to frame a legal issue. They also contend the District Court did not identify factual disputes material to immunity and invite this Court to reassess the record.

This interlocutory appeal is jurisdictionally barred because the order denying immunity turns on disputed facts, not pure law. *Johnson v. Jones* forbids interlocutory review where the denial of immunity rests on evidentiary sufficiency or factual disputes, 515 U.S. 304, 313, 319–20 (1995). Here, the district court identified triable questions central to any planning-immunity claim under New York law, including whether the TA actually conducted an adequate study addressing the recurring hazard of three to five people per week being struck by trains and whether any resulting plan had a rational basis—precisely the predicates *Weiss v. Fote* requires a duly authorized planning body to have "entertained and passed on" after adequate study. 7 N.Y.2d 579, 585–89 (1960). New York law further demands a reasonable study of known hazards. *Turturro v. City of New York*, 28 N.Y.3d 469, 480 (2016). These are jury issues, not "pure law," and *Johnson* prohibits reweighing them on interlocutory appeal.

Nor can Appellants manufacture jurisdiction by "accepting" Appellee's facts in the abstract. Collateral-order review lies only if, taking the facts the District Court deemed triable in the light most favorable to the nonmovant, the defendant would prevail on a purely legal question. *Johnson*, 515 U.S. at 313. On the facts credited below, the *Weiss* prerequisites of adequate study and rational basis cannot be established as a matter of law. Because Appellants' path to "immunity" depends on disputing those facts, this Court lacks interlocutory jurisdiction to entertain their appeal.

### C. Orders denying state-law immunity are reviewable after final judgment.

Because New York's governmental-function and planning "qualified" immunities are defenses to liability—not immunities from suit—their denial does not fall within § 1291's narrow collateral-order exception and is reviewable after final judgment. *In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d 169, 175, 179, 181–83 (2d Cir. 2008); *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 875 (1994); *Mitchell v. Forsyth*, 472 U.S. 511, 526–27 (1985); *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). The appeal should be dismissed for lack of jurisdiction.

## II. THE DISTRICT COURT CORRECTLY HELD THAT SUBWAY OPERATION IS A PROPRIETARY FUNCTION AND DENIED APPELLANTS' SUMMARY JUDGMENT MOTION ON THE BASIS OF GOVERNMENTAL IMMUNITY.

### A. The District Court correctly held that operation of the subway is a proprietary function.

Under New York law, the capacity inquiry "turns solely on the acts or omissions claimed to have caused the injury," not on high-level labels about

security or budgeting. *Matter of World Trade Center Bombing Litigation*, 17 N.Y.3d 428, 447 (2011). Here, the conduct at issue is the day-to-day design, maintenance, and operation of passenger platforms—including decisions about platform-edge barriers, or TIDS,—which courts have squarely classified as proprietary when performed by the TA. See, M*artinez v. New York City Transit Auth*., 203 A.D.3d 87, 93–95 (1st Dep't 2022); *Pedraza v. New York City Transit Auth*., 203 A.D.3d 95, 101–05 (1st Dep't 2022); *accord, Turturro v. City of New York*, 28 N.Y.3d 469, 477–78 (2016). Appellants' attempt to reframe these operational duties as "safety/security" policy or capital budgeting is therefore legally irrelevant to the proprietary classification.

Appellants' Point C (Br. 15–18) asserts that decisions regarding platform-edge barriers (including PSDs, PEGs) and track-intrusion detection systems (TIDS) implicate public safety, security, and large-scale capital budgeting, and therefore should be classified as governmental functions. That position misstates New York law. Courts must first classify the specific act or omission giving rise to the injury as proprietary or governmental; only the latter can trigger governmental-function immunity. *Applewhite v. Accuhealth, Inc.*, 21 N.Y.3d 420, 425 (2013); *Turturro v. City of New York*, 28 N.Y.3d 469, 477–78 (2016). The conduct at issue—designing, maintaining, and safely operating passenger platforms, including the selection and deployment of platform-edge protection and warning systems—falls within the day-to-day operations of a common carrier and is therefore proprietary.

More than a century of authority confirms this classification. New York has long recognized that rapid-transit services are proprietary because "transportation is traditionally operated by private enterprise." *Matter of Bd. of Rapid Transit R.R. Comm'rs of New York City*, 197 N.Y. 81, 96 (1909); see *New York & Queens Electric Light & Power Co. v. City of New York*, 221 A.D. 544, 544 (1st Dep't 1927) (characterizing elevated-line construction as a business enterprise); *Clinger v. New York City Transit Authority*, 85 N.Y.2d 957, 959 (1995) (affirming liability for proprietary transit functions); *Martinez v. New York City Transit Authority*, 203 A.D.3d 87, 93 (1st Dep't 2022); *Pedraza v. New York City Transit Authority*, 203 A.D.3d 95, 105 (1st Dep't 2022). These decisions foreclose reclassifying platform-safety measures as governmental merely because they involve technical judgments or are implemented at scale.

In the District Court, the TA argued that it was entitled to governmental immunity under Public Authorities Law § 1202(2), asserting that the challenged conduct—its systemwide decision not to install platform screen doors or other protective barriers—was inherently governmental. But the New York Court of Appeals in *Crosland v. New York City Transit Authority*, 68 N.Y.2d 165 (1986), squarely rejected reliance on § 1202(2) as a basis for immunity. The Court held that § 1202(2) does not shield the Authority from suit when the claim arises from conduct outside the narrow sphere of policy-based "allocation of police resources." *Id.* at 169–70. Crucially, the Court reaffirmed that "[i]t is the specific act or omission out of which the injury is claimed to have arisen and the capacity

in which that act or failure to act occurred which governs liability," not the mere fact that the Authority is a public entity. *Id.* at 169 (quoting *Weiner v. Metropolitan Transp. Auth.*, 55 N.Y.2d 175, 182 (1982)). On appeal, the Transit Authority repeats the same immunity theory, again seeking to characterize its safety-related omissions as governmental—but it simply omits explicit citation to § 1202(2). *Crosland* makes clear that this reframing does not alter the controlling law: the Authority cannot invoke governmental-function immunity where, as here, plaintiffs challenge acts and omissions directly tied to passenger safety rather than discretionary police-resource decisions.

In *Martinez v. New York City Transit Authority*, 203 A.D.3d 87 (1st Dep't 2022), a passenger who fell onto the tracks argued the TA should have imposed speed restrictions on trains entering a curved station because limited sightlines prevented timely stopping. The TA contended that its speed policy was immune as a discretionary act. The Appellate Division rejected the governmental-immunity characterization, holding that because "transportation is traditionally operated by private enterprise," the Authority's discretionary acts in running the subway occur in its proprietary capacity and are not shielded by governmental-function immunity. *Id***.** at 93. The court further held that triable issues concerning the reasonableness of the Authority's lack of a reduced-speed policy on the curved approach precluded summary judgment because the Authority's cited studies lacked the requisite station-specificity. *Id***.** at 93–94. Decisions about platform-edge barriers and TIDS fall within the same proprietary sphere and, under

*Martinez*, must be adjudicated under ordinary negligence standards rather than insulated as governmental policy.

The Court of Appeals' decision in *Turturro v. City of New York,* 28 N.Y.3d 469 (2016), forecloses Appellants' effort to reframe a proprietary operations case as one about police or security. There, a child riding a bicycle was struck by a speeding car on a city street. The City argued the claims sounded in police protection—failure to enforce the speed limit—so governmental-function immunity and special-duty rules applied. The Court rejected that reframing and held the "primary capacity" inquiry "turns solely on the acts or omissions claimed to have caused the injury," which in *Turturro* were the City's failures to study and implement traffic-calming measures needed to keep the roadway reasonably safe—conduct in the proprietary sphere. *Id.* at 480–81. The same analysis controls here.

Appellants attempt to recast Ms. Da Silva's claims as those involving system security or policing must fail; the gravamen of her claims is the TA's failure to maintain platforms in a reasonably safe condition by adopting station-appropriate platform-edge protections and warnings. Under *Turturro*, that is proprietary, not governmental, and governmental-function immunity does not apply. *Id.* at 480–81.

*Miller v. State,* 62 N.Y.2d 506 (1984) further illustrates that when the State operates a facility traditionally run by private actors, it is subject to the same duties as a private landowner. The Court of Appeals held that a student raped in a

state-operated dormitory could recover because the university, in its capacity as a landlord, failed to lock the doors; when the State acts as a landlord, it must maintain its property in a reasonably safe condition. *Id*. at 517. That principle extends to the TA's obligation to maintain subway platforms in a reasonably safe condition—including implementing known safety measures to prevent foreseeable falls by customers onto the train tracks and the recurring hazard of train strikes.

Finally, the Second Circuit's decision in *In re World Trade Center Disaster Site Litigation* clarifies the posture of state-law immunities. The court held that New York's governmental-function doctrine "functions as a defense to liability," not a right to avoid trial, and thus denials of that defense are reviewable only after final judgment. 521 F.3d 169, 175, 179 (2d Cir. 2008). That ruling underscores that state-law immunity is not an immunity from suit and does not confer interlocutory jurisdiction.

Taken together, these authorities demonstrate that the TA's conduct here—operating the subway and deciding whether to install platform-edge barriers or TIDS—falls squarely within its proprietary role. The cases emphasize that even when discretionary decisions involve public safety and significant expenditures, the inquiry focuses on the specific act causing the injury and whether it is historically performed by a private enterprise. Appellants' claim that safety, security, and cost considerations transform their proprietary duties into governmental functions is inconsistent with New York precedent. Because the TA

failed to conduct a study on how to prevent or reduce the known danger of train strikes, and because platform-safety decisions substitute for private enterprise, the District Court correctly denied governmental immunity.

### B. Appellants' reliance on *Haddock v City of New York* is misplaced: Appellants failed to exercise discretion because they failed to comply with their own System Safety Program Plan or the Required Hazard Analysis.

*Haddock v. City of New York*, 75 N.Y.2d 478 (1990) *limits*, rather than expands, governmental immunity. There, the City claimed immunity for retaining an ex-convict who raped a child; the Court of Appeals rejected immunity because the City failed to exercise informed discretion and did not follow its own personnel procedures for employees with criminal records. *Id*. at 484–85. *Haddock* thus stands for the principle that discretionary immunity "presupposes an exercise of discretion in compliance with [the agency's] own procedures," and does not protect a municipality that ignores mandatory safety protocols. *Id*. The TA's invocation of *Haddock* collapses under the undisputed record showing that the TA did not comply with its own mandated procedures, outlined in the SSPP, which required a hazard analyses for how to prevent or reduce the recurring hazard of train strikes, and did not exercise any reasoned judgment about installation of platform barriers or warning systems when the evidence showed their "awareness campaigns" were ineffective.

The SSPP requires compliance with MIL-STD-882E, including identification of hazards, assessment of severity and probability, assignment of a Risk Assessment Code ("RAC"), and implementation of corrective measures to reduce

high hazards to acceptable levels. A "RAC 1A"—Catastrophic × Frequent—is deemed "unacceptable" and may require "immediate corrective action." (SA 86-87) Platform falls and train strikes fall directly within this RAC-1A category. Yet the Authority failed to conduct any hazard analysis, any comparative-effectiveness study of potential controls before Ms. Da Silva's injury or implement a corrective-action plan. Multiple senior Transit Authority officials and engineers confirmed these failures in their deposition testimony. *See supra*, pp. 8-15.

These concessions place this case squarely within *Haddock's* rule: an agency that fails to follow its own safety procedures cannot invoke governmental immunity. The TA's failure to conduct the required hazard analyses, to classify and resolve RAC-1A hazards, and to adopt corrective measures before the subject accident mirrors the procedural noncompliance that defeated immunity in *Haddock*. Because the TA did not perform the mandated SSPP/MIL-STD-882 evaluation—and indeed, affirmatively testified that *no such study exists*—it cannot claim that it exercised informed, discretionary judgment.

**B. Appellants omit Da Silva's arguments that if PSDs were infeasible, then Appellants had to take other remedial measures like installation of fixed guardrails.**

Appellants incorrectly portray Ms. Da Silva's negligence theory as limited to the failure to install full-height PSDs or TIDS. From the outset, however, she argued that the TA was required to adopt some reasonable station-specific protective measure: PSDs where feasible, or other types of barriers, including fixed guardrails, where PSDs were infeasible. Fixed rails were installed at certain

stations, like the Times Square Shuttle, over 100 years ago. (SA 216-217 [¶ 50], 911) Dr. Carl Berkowitz's expert report explains that:

> An adequate safety plan requires a proper hazard analysis and also would have required the development of a corrective action safety plan for each station. In other words, each station would be required to implement a plan to prevent people from being exposed to the open track way, accessing the tracks and being struck and killed on the platform or the tracks. Because each station is unique, a "one size fits all plan" is infeasible. A solution that works for one station, like PSDs, might not work for other stations. However, a proper hazard analysis requires a safety plan for each station, independent of what might work or not work at other stations.
>
> Instead of conducting a proper a hazard analysis and coming up with corrective action plans and monitoring them for effectiveness and developing safety plans for each station, over the years, the TA has repeatedly rejected proposals to install PSDs or other safety measures at some stations, because they wanted a "one-size-fits-all" solution for the entire system. This decision lacks any rational basis and violates MIL-STD-882, which requires the unacceptable hazard to be eliminated, and if that is not possible, to be reduced to the maximum extent possible.

(SA 95-96)

The record—including the TA's subsequent installation of Fixed Rails systemwide beginning in January 2024—confirms that fixed guardrails were feasible and cost-effective, and contradicts the claims by Korach and Abdallah that such barriers were infeasible or dangerous. Under Fed. R. Evid. 407, such subsequent remedial measures are admissible to impeach claims of infeasibility and to show that proposed safety measures were in fact practicable. See, *Bellinger*

*v. Deere & Co.*, 881 F. Supp. 813, 818–19 (N.D.N.Y. 1995) (admitting evidence that another model of manufacturer's corn pickers had covered husking box to prove feasibility of such cover on model at issue); *Almonte v. Averna Vision & Robotics, Inc.*, 128 F. Supp. 3d 729, 751 n.15 (W.D.N.Y. 2015) (Rule 407 did not bar evidence of post-accident guarding where offered to show feasibility and feasibility was disputed). This evidence demonstrates that the TA rejected fixed guardrails without any feasibility study and relied instead on conclusory suppositions of danger and expense—the very sort of unsupported judgment *Weiss* and *Affleck* refuse to shield. See *Weiss v. Fote*, 7 N.Y.2d 579, 585–89 (1960); *Affleck v. Buckley*, 96 N.Y.2d 553, 558 (2001).

## III. APPELLANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.

### A. Legal Standard

Under New York law, planning (qualified) immunity applies only if a duly authorized planning body actually "entertained and passed on the very same question of risk" after an adequate, hazard-specific study, adopted a plan with a reasonable basis, and complied with its continuing duty to review the plan in light of actual operations. *Turturro v. City of New York*, 28 N.Y.3d 469, 480–81, 486–88 (2016); *Weiss v. Fote*, 7 N.Y.2d 579, 585–89 (1960). A municipality "may be held liable when its study of a traffic condition is plainly inadequate or there is no reasonable basis for its … plan," and it must revisit its plan when experience shows it is unsafe. *Turturro*, 28 N.Y.3d at 480–81 (quotation marks omitted). The defense is an affirmative one; the public entity bears the burden to prove both the

adequacy of the study and the rational basis of the plan. These principles supply the framework for evaluating Appellants' claims here.

### B. Whether There Was an Adequate Study and a Reasonable Safety Plan Was for the Jury.

Appellants argue that decades of generalized consideration of PSDs and TIDS bars a jury from evaluating their failure to adopt platform-edge protections. That misstates New York law, which requires a jury to decide whether the governmental entity conducted an adequate, hazard-specific study and whether any resulting plan had a reasonable basis. *Weiss v. Fote* makes clear that planning immunity applies only when a duly authorized body has actually studied the *specific* risk and adopted a rational plan to alleviate *that* danger; decisions "evolved without adequate study" or lacking a reasonable basis remain subject to jury review. 7 N.Y.2d 579, 585–89 (1960).

The Court of Appeals confirmed in *Turturro* that immunity arises "only where a duly authorized public planning body has entertained and passed on the very same question of risk as would ordinarily go to the jury," and it held that whether the City performed such a study was itself a jury question. *Turturro v. City of New York*, 28 N.Y.3d 469, 482–83 ("As discussed below, whether the City's negligence was a substantial factor in causing the accident or Pascarella's speeding was the sole proximate cause, and whether the City was entitled to qualified immunity based on its response to those repeated complaints, were both issues to be resolved by the jury."). The Appellate Division of the Supreme Court, State of New York, First Judicial Department (hereinafter "First Department") applied the

same rule in *Martinez*, 203 A.D.3d at 93–95, rejecting qualified immunity where the TA offered no station-specific analysis of sight-line hazards, and in *Pedraza*, 203 A.D.3d at 101–04, where the court remanded the case for a re-trial to allow the TA to attempt to prove that it performed a reasoned, hazard-focused study.

These authorities underscore the dispositive point: the question is not whether jurors may "second-guess" transit policy, but whether the TA actually performed the hazard-specific study that *Weiss* and *Turturro* require. Because the record contains substantial disputes on whether any study or reasonable plan existed, the issue was properly for the jury, not for resolution as a matter of law.

### C. Appellants' Claim that No Formal Study is Required to Demonstrate Entitlement to Qualified Immunity Misstates the Law.

Appellants misstate the law and claim that "the case law does not require a 'safety study' or any formal study to obtain qualified immunity." Dkt. 25.1, App. Br. at 21 fn. 7 (Citing *McCord v City of New York*, 298 A.D.2d 438, 439 [2 Dept 2002]; *Zambrana v New York City Tr. Auth*., 14 A.D.3d 23 [1 Dept 2004]). Instead, they claim that "to establish entitlement to qualified immunity, the governmental body must demonstrate 'that the relevant discretionary determination was the result of a deliberative decision-making process'" Dkt. 25.1, App. Br. at 21 fn. 7. (Citing *Ramirez v State of New York*, 143 A.D.3d 880 [2nd Dept 2016][citations omitted]; *Heins v Vanbourgondien*, 180 A.D.3d 1019 [2nd Dept 2020]["The relevant discretionary determination resulted from a "deliberative decision-making process"]).

Appellants misstate the cases they cite. Each decision they invoke reaffirms that qualified immunity attaches only where a duly authorized body actually studied the same safety risk the jury would assess, adopted a plan with a reasonable basis, and then reviewed the plan in light of its actual operation. *Turturro v. City of New York*, 28 N.Y.3d 469, 480 (2016)

In *Zambrana v. New York City Transit Authority*, the First Department affirmed qualified immunity only because the Transit Authority had "entertained and passed on the very same question of risk" implicated by the plaintiff's claim—whether to keep inter-car doors unlocked—and adopted a policy with a "reasonable basis" grounded in safety and efficiency (unlocking to ensure a ready means of egress if a train became trapped below ground). 14 A.D.3d 23, 25 (1st Dep't 2004) (citing *DeLeon v New York City Tr. Auth.*, 305 AD2d 227, 228 [2003], *quoting Weiss v. Fote*, 7 N.Y.2d 579, 588–89 (1960)). The court's analysis thus turned on a hazard-specific, reasoned judgment—not on the notion that no study is required.

Likewise, in *McCord v. City of New York*, the Second Department applied *Weiss* and held the TA was entitled to qualified immunity for locking inter-car doors because the plaintiff "failed to raise a triable issue of fact as to whether the decision … was made without adequate study or that it lacked a reasonable basis." 298 A.D.2d 438, 439 (2nd Dep't 2002) (citing *Weiss*, 7 N.Y.2d at 589). *McCord* therefore reinforces that immunity attaches only where the record shows an adequate study and a rational basis tied to the specific safety risk at issue, not

merely a generalized "deliberative process." A "deliberative process" is legally insufficient unless it addresses *the very same question of risk* a jury must decide and results in a rational plan. *Weiss v. Fote*, 7 N.Y.2d 579, 585–89 (1960); *Turturro v. City of New York*, 28 N.Y.3d 469, 480–81, 486–88 (2016).

In *Heins v. Vanbourgondien*, the Second Department squarely rejected qualified immunity because the County "failed to proffer evidence" that any authorized body engaged in a "deliberate decision-making process" about the roadway design or "passed on the very same question of risk as would ordinarily go to the jury." 180 A.D.3d 1019, 1022–23 (2nd Dep't 2020) (quoting *Ramirez v. State*, 143 A.D.3d 880, 881 (2nd Dep't 2016), and *Turturro v. City of New York*, 28 N.Y.3d 469, 480 (2016)). *Heins* thus confirms that immunity is unavailable where the government cannot show a record of authorized, reasoned analysis directed to the particular safety hazard at issue—precisely the gap here, where Appellants never performed a station-specific platform-edge hazard study under its System Safety Program Plan (SSPP) or MIL-STD-882 framework.

*Ramirez v. State* also does not help Appellants; it illustrates what is missing from their record. There, the Second Department affirmed the Court of Claims' decision granting the State qualified immunity because it proved at trial that the guardrail "was designed pursuant to the design standards set forth by the New York State Department of Transportation," i.e., the product of a recognized, "deliberate decision-making process" entitled to deference. 143 A.D.3d at 881-882. By contrast, here, Appellants did not adhere to its own governing standards

(the SSPP/MIL-STD-882 hazard-analysis process), did not identify and analyze the platform-edge hazard at the subject station, and did not adopt or implement corrective measures commensurate with its High-Hazard (RAC-1A) designation—failures that place this case squarely on the *Heins* side of the line, not *Ramirez*. See *Heins*, 180 A.D.3d at 1022–23 (no immunity absent proof of a deliberative process on the precise risk); *Ramirez*, 143 A.D.3d at 881–82 (immunity where the State proved compliance with DOT design standards).

These authorities do not support Appellants' claim that "no study" is required or that a generic "deliberative process" suffices. They undermine, rather than support, Appellants' proposition that qualified immunity can be claimed here without a station-specific, hazard-focused safety study of platform-edge protection and TIDS.

## D. Appellants Did Not Conduct an Adequate Safety Study.

Planning immunity applies only where a duly authorized body *actually* conducts an adequate, hazard-specific study, adopts a plan with a reasonable basis, and reassesses that plan in light of real-world experience. Appellants' record fails to satisfy these requirements. Their Appendix omits their own federally mandated SSPP, which in turn required the MIL-STD-882 hazard-analysis framework, documents showing no-cost barrier options and canceled PSD pilot projects, and materials demonstrating the feasibility of fixed guardrails. It also omits all the deposition testimony where senior Transit officials concede that no

study was ever conducted. These omissions highlight that their "we studied it" narrative is factually disputed and legally insufficient.

The governing methodology—MIL-STD-882 and the TA's own SSPP—requires identification of the specific hazard, severity-and-probability analysis, root-cause evaluation, adoption of corrective measures that reduce the hazard to acceptable levels, and periodic review. The TA's Rule 30(b)(6) witness admitted that its OSS was required to apply this methodology and that platform-edge hazards were classified as RAC-1A—an "unacceptable" condition requiring immediate corrective action. Yet the TA failed to conduct any station-specific hazard analysis for Atlantic Avenue–Barclays, failed to produce any SSPP/MIL-STD-882 study for barriers or TIDS before Ms. Da Silva's injury, and failed to implement a corrective-action plan. Under *Weiss*, that is the paradigm of a decision "evolved without adequate study."

The deposition testimony in the record confirms that no such study was ever performed. Jones admitted there were no formal studies to reduce or prevent train strikes, no comparative analysis of outcomes with PSDs, CCTV, TIDs, or fixed rails, and no comprehensive platform-door feasibility study until 2017–2019, *after* Ms. Da Silva's accident. (SA 263-265, 270-272, 282-284, 292-294). Kennedy testified there was no pre-accident study on "how to best prevent or reduce" train strikes system-wide or at Atlantic Avenue–Barclays, no comparison of fatalities and serious injuries with and without safety devices, and no station-by-station analysis determining which devices should be installed. (SA 319, 327-332, 387-

391, 400, 405-407, 465). Former TA Presidents Prendergast and Reuter likewise could not identify any proper, professionally compliant study under Military Standard 882 to determine how to prevent or reduce "12-9s"; engineer Sanchez and OSS Sullivan confirmed they were unaware of any station-by-station feasibility or root-cause analysis at all. . (SA (Prendergast) 484-489, 496, 504, 507-510, 520; (Reuter) 568-569, 572-573, 579, 594-595, 628; (Sanchez) 686-688, 723, 726; (Sullivan) 773, 777). These are not disputed characterizations; they are admissions wrung from these adverse high-level employees that no adequate, hazard-specific study was ever done.

Appellants' reliance on foreign site visits, vendor outreach, and system-wide cost estimates is legally irrelevant because these materials do not "entertain and pass on" the same risk the jury was required to decide: whether the TA studied the frequent and recurring hazard of train strikes, adopted a plan with a reasonable basis, and reviewed the plan in light of its actual operation. The only purported "feasibility study" they cite was completed years *after* Ms. Da Silva's accident and cannot retroactively satisfy the pre-incident study that *Weiss* and *Turturro* require. As *Martinez* confirms, generalized analyses that lack location-specific evaluation do not establish planning immunity.

The undisputed record also shows prolonged, unjustified delays in implementing any mitigation—the TA canceled PSD pilot projects for over a decade, despite no-cost proposals to perform such projects from multiple vendors. Speculation about crowding or delay replaced hazard analysis, contrary to *Weiss*

and *Affleck*. The TA likewise rejected BOT financing options and declined interim measures such as fixed guardrails—measures the Authority began installing systemwide shortly after Ms. Da Silva's they filed their motion for summary judgment, undercutting the TA's claims (in the summary judgment declarations of Abdallah and Korach) of infeasibility. These facts establish that the TA neither studied nor reasonably addressed a known RAC-1A hazard, defeating planning immunity as a matter of law.

**E. Appellants' Evidence Lacks the Requisite Specificity.**

Appellants' brief leans heavily on general feasibility estimates and systemwide cost projections, but they fail to identify any study addressing the hazard at the Atlantic Avenue–Barclays Center station or any similarly configured station. In *Martinez v. New York City Transit Authority*, *supra,* the First Department rejected the TA's qualified-immunity claim despite its speed-policy committee having undertaken studies, because those studies lacked the requisite specificity for the curved track where the plaintiff was injured; the court found that general policies were insufficient to show a reasonable basis. 203 A.D.3d at 94.

The same is true here: generic discussions of cost, technology, and security do not constitute the hazard-specific study that *Weiss* and *Turturro* demand. The summary judgment record demonstrates that the TA never applied its own hazard-analysis process to the station where Da Silva fell and never reconciled the RAC-1A designation with its adherence to an ineffective public awareness

campaign (SA 252-296). Without that specificity, Appellants cannot meet their burden to show a rational basis for rejecting safety devices.

### F. Rejection of Cost-Free Proposals Undermines Reasonableness.

Appellants assert that installing PSDs across the system would cost "$7 billion," painting any platform-edge barrier as prohibitively expensive. That figure ignores record evidence that numerous contractors offered to bear the costs of installation and maintenance through revenue recouped in advertising rights, and that the Hudson Yards Development Corporation proposed funding the installation of PSDs in #7 subway line extension. In addition, several other highly reputable engineering and infrastructural companies made similar offers to construct platform-edge barriers free of cost, including Faively Transport and TIS/SMRT Partners (SA 826, 850, 895). The TA refused to pursue these cost-free options or even to test them, choosing instead to cancel the only PSD pilot projects it had scheduled. (SA 436, 527-529, 656) Such conduct is arbitrary, not deliberative. *Affleck* and *Giske* teach that immunity attaches only where the government shows it "actually exercised its discretion in a reasoned manner" by evaluating alternatives and adopting a plan with a rational basis. *Giske v. State*, 191 A.D.2d 675, 676 (2nd Dept 1993); *Affleck*, 96 N.Y.2d at 558. The refusal to explore cost-free or low-cost proposals—when passengers were being catastrophically or fatally injured three-five times a week, cannot satisfy that standard.

### G. Post-Incident Barrier Installations Undercut Appellants' Infeasibility Claims and Confirm the Absence of Any Reasoned, Hazard-Specific Study.

From the outset, Plaintiff did not demand only full-height PSDs; she advanced a suite of feasible platform-edge protections and specifically identified fixed guardrails as an immediately deployable measure at stations where PSDs were claimed to be difficult. Dr. Berkowitz explained that fixed guardrails could be installed without creating new hazards, would materially reduce track strike incidents, and were practicable across the system. (SA 100) Appellants ignore Appellee's guardrail theory and instead recasts the case as a "PSDs-only" challenge, relying on systemwide PSD cost figures to characterize the issue as a high-level policy judgment. That framing is flatly contradicted by the summary-judgment record and by the TA's subsequent conduct.

The Abdallah declaration asserted that fixed guardrails were "infeasible" and "dangerous," including claims that conductors could strike their heads and that guardrails would introduce new platform hazards. (Dkt 24.1, Abdallah Decl. ¶¶ 15, 72–73.) Appellant's expert, Kenneth Korach, similarly declared that fixed guardrails were hazardous and "never allowed" in U.S. rail transit systems. (SA 233) Yet shortly after Ms. Da Silva served her opposition to the summary judgment below, the TA began installing fixed guardrails on revenue platforms and has since expanded installations systemwide—the very interim and permanent mitigation Ms. Da Silva proposed for stations where PSDs were alleged to be impracticable. This rapid rollout is powerful evidence that fixed guardrails are neither infeasible

nor inherently dangerous, and that Abdallah and Korach's contrary assertions lack a factual basis. Under *Weiss* and *Affleck*, planning immunity is unavailable where a decision "evolved without adequate study" or where the agency fails to exercise its discretion "in a reasoned manner"; post-incident implementation of guardrails both impeaches the Abdallah and Korach declarations and demonstrates that a reasonable, hazard-targeted mitigation existed all along. *Weiss v. Fote*, 7 N.Y.2d 579, 585–89 (1960); *Affleck v. Buckley*, 96 N.Y.2d 553, 558 (2001).

At the same time, Appellants fail to identify any pre-incident, station-specific hazard analysis applying the SSPP and MIL-STD-882 framework to platform-edge protections at Atlantic Avenue–Barclays Center. They point to foreign site visits (all of which confirmed and corroborated the efficacy of PSDs), vendor meetings, and a supposed "2½-year feasibility study," but none of these materials "entertain and pass on the very same question of risk" that would ordinarily go to the jury—whether fixed guardrails (or other barriers such as PEGs or RPSDs) should be installed at this station to address the risk of passengers being hit by trains because they fell from the unprotected platforms onto active train tracks. See, *Turturro v. City of New York*, 28 N.Y.3d 469, 480–81, 486–88 (2016); *Weiss*, 7 N.Y.2d at 585–89.

Their Appendix omits the SSPP, omits any MIL-STD-882 analysis, and offers only Abdallah's narrative summaries and cost assertions—now directly contradicted by the TA's own guardrail installation program. As *Martinez* holds, generalized submissions that lack location-specific analysis are insufficient to

establish qualified immunity. *Martinez v. N.Y.C. Transit Auth*., 203 A.D.3d 87, 93–94 (1st Dep't 2022).

Taken together, the TA's pre-incident failure to perform a focused, station-specific hazard study and its post-incident systemwide guardrail rollout demonstrate that Appellants neither studied nor reasonably addressed a known RAC-1A hazard before Ms. Da Silva's injury. The post-incident program is properly considered for feasibility and impeachment, and it confirms the core factual disputes the jury resolved in Ms. Da Silva's favor: that as of August 2, 2016, the Transit Authority failed to conduct any study of persons falling onto the tracks and being hit by trains. Under *Weiss, Turturro, Affleck*, and *Martinez*, those disputed issues defeat any claim to planning or governmental immunity.

## CONCLUSION

This Court lacks jurisdiction over Appellants' interlocutory appeal because state-law governmental and qualified immunity are affirmative defenses to liability, not immunities from suit, and the district court's denial rests on disputed facts. Even if the Court reaches the merits, the District Court's order should be affirmed. The operation of the subway is a proprietary function, and Appellants' failure to provide basic safety measures does not qualify for governmental or qualified immunity.

Dated: New York, New York
December 5, 2025

Respectfully submitted,

____________________________

Elliot Dolby Shields
David A. Roth
Roth & Roth, LLP
Co-Counsel for Plaintiff-Appellee
192 Lexington Avenue, Suite 802
New York, New York 10016
Phone: (212) 425 1020
E-mail:eshields@RothandRothLaw.com

Robert Genis
Sonin & Genis, Esqs.
Co-Counsel for Plaintiff-Appellee
One Fordham Plaza - Suite 907
Bronx, New York 10458
(718) 561-4444

# CERTIFICATION

ELLIOT SHIELDS, hereby declares under penalty of perjury that the following is true and correct:

I am the attorney for Plaintiff-Appellee herein, I hereby certify, pursuant to FRAP 32(g)(1), that this document does not comply with the type-volume limitation of FRAP 27(d)(2)(A) in that it contains 12,974 words, excluding the parts exempted by FRAP 32(f). The number of words has been determined by using the word count function of Microsoft Word 2025.

Dated: New York, New York
December 5, 2025

Respectfully submitted,

______________________________

Elliot Dolby Shields
Roth & Roth, LLP
Counsel for Plaintiff-Appellee
192 Lexington Avenue, Suite 802
New York, New York 10016
Phone: (212) 425 1020
E-mail:eshields@RothandRothLaw.com